UNITED STATES of America, Plaintiff,

v.

Dwight JOHNSON, Reginald Johnson, Cleotha T. Johnson, Regina Ramsey, and S.T. Cross, Defendants.

No. 91–Cr–283.

United States District Court, E.D. Wisconsin.

Dec. 21, 1993.

Patrick C. Brennan, Milwaukee, WI, for Regina Ramsey.

Thomas Wilmouth, Milwaukee, WI, for S.T. Cross.

## *ORDER*

TERENCE T. EVANS, Chief Judge.

In December 1991, Reginald Johnson, Dwight Johnson, Cleotha Johnson, Regina Ramsey, S.T. Cross, Jr. and five others were indicted on charges of cocaine trafficking and related offenses. The superseding indictment against them contained twenty counts. This then was a major case that became known as the "Cross" case, even after the lead defendant, Kenneth Cross, entered a guilty plea. The five defendants currently before me were found guilty by a jury in July of 1992 after a trial that lasted 9 days.

Nearly 8 months after the jury trial, on March 4, 1993, attorney Michael Fitzgerald, who had represented defendant Dwight Johnson, was sitting in a state court preliminary hearing room. He heard a lawyer, Public Defender Peter Goldberg, calling out the name of a client—Sabrina Owens. Perking up, Fitzgerald recognized that Sabrina Owens was the name of the government informant who testified against his client and others during the Cross trial. What, he wanted to know, was Ms. Owens doing at a state court preliminary hearing? He and the other defense lawyers investigated. What they discovered led to the currently pending motion for a new trial in which they allege that the government, in violation of the law, failed to disclose material facts regarding Sabrina Owens to the defense before trial. A 2-day hearing on the motion, during which 23 witnesses testified, was held on August 13 and 17, 1993.

At the hearing, Assistant United States Attorney Joseph R. Wall ably represented the government; the super-alert Mr. Fitzgerald represented Dwight Johnson; Patrick C. Brennan represented Regina Ramsey; Brian W. Gleason represented Reginald Johnson; William Binder represented Cleotha Johnson, and Thomas G. Wilmouth represented S.T. Cross, Jr. The five defense

Joseph Wall, Asst. U.S. Atty., Milwaukee, WI, for plaintiff.

Michael Fitzgerald, Coffey, Coffey & Geraghty, Milwaukee, WI, for Dwight Johnson.

Brian Gleason, Milwaukee, WI, for Reginald Johnson.

William Binder, Brookfield, WI, for Cleotha Johnson.

attorneys had each represented their respective clients during the 1992 jury trial.

While the evidence at the hearing did not reveal anything like a major league coverup by the government, it did raise legitimate and substantial questions about what happened. My decision on the motion follows.

Sabrina Owens had been working undercover with two Milwaukee police officers on cases unrelated to this one. In the spring of 1991 Thomas Gorecki, a Milwaukee police detective assigned to the federal Drug Enforcement Administration and the lead agent in the Cross case, started to talk with Sabrina Owens. He wanted her to work with him, making controlled drug buys. She put him off. On April 28, 1991, Ms. Owens' 2-month-old baby died. The death was ruled a homicide by the medical examiner. Owens was a suspect in the homicide. She took a lie detector test, the results of which were inconclusive because of her use of cocaine. In the late spring of 1991, Ms. Owens decided to work with Officer Gorecki.

According to Gorecki, Owens made her first controlled drug buy under his direction on July 23, 1991. Other drug buys were made, and Ms. Owens received payment for them from the DEA. Eventually it was agreed that Ms. Owens would receive 18 to 25 per cent of any forfeitures of property ordered as a result of her work. In addition, the government agreed to provide for her safety, which included a move out of town.

At trial, Ms. Owens testified against the five defendants. She was an important witness, but by no means the only important witness for the government. She was shown to be a paid witness, who received considerable sums of money for her day-to-day controlled drug buys. The jury also knew that she was to receive a large cash payment from the eventual forfeitures in the case. Other problems regarding Ms. Owens that were revealed at trial are that she skimmed drug "buy" money, sold drugs for her own profit, slept with the target of the investigation, and was in drug treatment. These things the defendants knew before trial. The jury learned these things during the trial.

At trial, the prosecution strategy for dealing with Ms. Owens' liabilities was set by Assistant United States Attorney Rodney Cubbie. He decided to present Ms. Owens as an example of the harm cocaine can do, and to credit her for turning her life around—"a phoenix rising from the ashes." Part of her turnaround was said to be her willingness, at considerable personal sacrifice, to help the government.

During closing arguments Mr. Cubbie argued that the defense was trying to mislead the jury, but that the government had presented the good and the bad about its witnesses; in particular, he said Sabrina Owens was told to come to court and tell the truth "regardless of what it was."

We know now that there were omissions on the negative side of the Sabrina Owens story. She was not exactly a Phoenix. She had a few other warts that the defense could not see. And the defense did not know that the government was helping Ms. Owens deal with those warts.

Before trial, in his letter to the defense attorneys, pursuant to *Brady v. Maryland*[1] and *Giglio v. United States*[2], Assistant United States Attorney William J. Lipscomb, the lead prosecutor in the case, said of her:

> *Sabrina Owens:* Sabrina Owens has no prior felony convictions. Owens began cooperating with DEA in May of 1991 and was strictly a paid informant. She received approximately $8,000 from DEA between May, 1991 and April, 1992. A large portion of the money was provided to move Owens for her personal security. In addition, beginning in April, 1992, the DEA paid for a month of inpatient treatment (cocaine use) for Owens and Owens continued treatment in a halfway house setting. Owens is following the treatment program and has not used cocaine since April, 1992.

However, what the defense did not know—and what the Lipscomb letter did not tell them—is that her life had not quite, as Mr. Cubbie subsequently put it, turned the cor-

1. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

ner. In fact, she had three pending state court problems, one of which the defense had learned of through rap sheets they obtained. The one the defense knew about was for retail theft. Another was for theft of a ring. And the third was a felony, a strong-armed robbery in Glendale, Wisconsin, which occurred on March 22, 1992, 3 months prior to the start of the jury trial in this case. The defense lawyers learned about these matters after the coincidence of Mr. Fitzgerald and Sabrina Owens having unrelated appearances in the same state courtroom on March 4, 1993, 8 months after the trial.

The issues in the motion for a new trial are whether Owens' state court problems (and the government's hand in helping her with them) should have been revealed to the defense in the "Giglio" letter, whether the results of the trial were compromised by the failure to reveal them, and, in any case, whether under the court's supervisory powers, a new trial should be granted.

The following facts are largely undisputed. The strong-armed robbery occurred in a Big Boy Restaurant on March 22, 1992. Sabrina Owens and her then-boyfriend, Thomas Richardson, were in the restaurant. When Sue Coughlin, another patron of the restaurant, went to the salad bar, Owens stole her purse, which Coughlin had left at her table. Owens then went to the cash register to pay for her meal with Coughlin's credit card. Then she started to leave the restaurant. At this point, Coughlin noticed what had happened and confronted Owens. Coughlin tried to grab her purse, but Owens resisted, bit Ms. Coughlin, and fled. When the police arrived at the scene, Richardson identified Owens as the robber.

A couple days later, Gorecki, who as previously noted was the lead agent in the case against the defendants, learned of the incident and discussed it with a Glendale police officer. Gorecki told the Glendale police that he would have Owens appear at the district attorney's office when it was required in connection with the Big Boy caper.

On March 26, 1992, Mr. Coughlin and Mr. Richardson made a positive photo identification of Owens. The case was turned over to the Glendale officer, who was the liaison with the district attorney's office, to have the case charged. The liaison officer was told at that time that Owens was a witness in a federal drug trial.

At some point, Officer Gorecki discussed things about Ms. Owens with AUSA Lipscomb. A decision was made to get Owens into a drug treatment program outside of Milwaukee. She checked into a treatment program in St. Paul, Minnesota, at the expense of the federal government, on April 4, 1992.

On April 14, 1992, Milwaukee County District Attorney William Hanrahan charged Owens with a felony—strong-armed robbery in connection with the Big Boy case. A warrant authorizing her arrest was issued.

Gorecki and Lipscomb realized that this situation posed a problem for them; they didn't want to be in the position of protecting a fugitive. Lipscomb authorized Gorecki to approach Assistant District Attorney Patrick Kenney, who is in charge of all felony drug prosecutions in the Milwaukee County district attorney's office, to request that the warrant be withdrawn. Kenney agreed to help. He sent a memorandum on May 15, 1992, to Assistant District Attorney Hanrahan, the net effect of which was that the strong-armed robbery complaint and warrant were withdrawn. A misdemeanor complaint and warrant arising out of a February 18, 1992, charge of a theft of a ring and an outstanding misdemeanor bench warrant were withdrawn. The latter resulted from Owens missing a court appearance on a charge of theft arising out of an allegation that as a clerk at a Shop Rite store, Ms. Owens had undercharged family members for groceries. Mr. Kenney authorized these actions, understanding that the cases were being delayed and that Gorecki had the obligation to bring them back into the system at the conclusion of the Cross trial.

That did not happen. In fact, one of the misdemeanor cases was dismissed. Hanrahan wrote a notation to the assistant district attorney then handling the case. He said:

> To A.D.A. in Misd. Ct.—please D/M on next date—D. has been instrumental in a number of controlled drug buys which

have netted some large, drug dealing fish. D. has been relocated and is receiving some sort of protection of Feds.

Hanrahan testified at the August 1993 motion hearing that he probably made this notation after talking with a detective, either Gorecki or Joseph Link. Gorecki acknowledged that he may have talked with Hanrahan, but he maintained that he did not ask him to dismiss the charges.

Whatever the reasons behind the dismissal, Kenney was not happy about it. He testified that the dismissal was not consistent with his memo: "It's totally inconsistent, in my view totally inappropriate." See transcript of motion hearing, p. 94. He was also asked his opinion about Detective Gorecki:

A. He has been a detective assigned to investigate drug offenses for the last six or seven years. I have handled his cases. He was—he had an excellent reputation as a detective. His cases were well prepared. His reports were well written, complete. He's a good witness. I've had him as a witness in cases. He always seemed to be thorough. In fact, he had an exceptional reputation for being someone who would cross the T's and dot the I's.

Q. You say back then. What does that mean, back then?

A. Well, I'm a little bit concerned about what happened in this case.

Q. How so?

A. Well, I'm very disappointed that these matters did not get back into court in July which is what my memo directs. Up until that time, up until what happened this spring, I had a very high opinion of Detective Gorecki and I hope that this is an isolated incident. I certainly have no reason to believe that it's anything other than an isolated incident.

Detective Gorecki has a different version of events. He acknowledged that he did not do anything to get the state cases reinstituted, but he said that he did not have to do anything at that time. He believed Owens was still a witness—even after the Cross trial was over. Further, he did not agree that he had led the Glendale people and the district attorney's office to believe that the state charges would be reinstituted after the July 1993 Cross trial.

The state cases did not actually get back into the state system until Owens made another mistake. She was arrested in February 2, 1993, again in Glendale, for possession of cocaine and marijuana and for obstructing an officer. She ended up in court, which is where she crossed paths with attorney Fitzgerald.

Other things were happening in the year or so prior to trial which show the interest that the federal officials had in Sabrina Owens. For one thing, the word was getting out to people in the state court system that Owens was quite important and was in witness protection or, in some cases, more specifically in the federal witness protection program.

After her baby died, a CHIPS (Children in need of Protection or Services) petition was filed to remove Ms. Owens' other children from her home. Assistant District Attorney Mary McCann instituted the action and Public Defender Kathleen Ozvat–Korte represented Owens. Both were somehow led to believe through conversations with Gorecki that in January 1992 Owens was an informant for the federal government, that she was out of state in drug treatment, and that she was in some sort of witness-protection program.

William Reddin was the state public defender who represented Ms. Owens in connection with the homicide investigation relative to the death of Mr. Owens'' baby. He closed his file on February 4, 1992, noting:

Client is working as a DEA informant—for 15% of all forfeited assets!! (Agent Gorecki). Has relocated to Seattle. Probably got a pass on this homicide due to her good work. Still has CHIPS case but not going anywhere in light of this info. No forwarding address. Close file.

Similarly, when asking for the bench warrant to be withdrawn pursuant to the Kenney memo, Milwaukee Police Detective Patrick Ross stated:

She is out of state right now, Your Honor, under the protective—She's going to be a

witness in a federal drug case. The length of this case was stayed to 07–22 of '92. Their case would be concluded at that time and she can be brought into court. She has several other cases that have been adjourned to that day also.

The government's interest in Owens continued after the Cross trial. In the summer of 1992, AUSA Cubbie called ADA McCann to see whether there was a possibility that Owens' children could be returned to her.

After her arrest in February 1993 a bail hearing was conducted. Assistant District Attorney James Blask asked for a $2,500 personal recognizance bond. The court commissioner was surprised:

> There is something about these cases I don't understand.
>
> . . . .
>
> Because it's rather unusual bail, low bail, for the state. You want to fill me in a little bit? Because I don't mind going along with the state's recommendation, but this one looks a little bit—I'm just curious of the underlying—

The response was that there should be no discussion on the record.

What had happened is that AUSA Cubbie had called and asked the DA's office to try to have low bail set. Blask's notes about that call say "Requests 'professional courtesy' of no bail."

The state public defender's case opening form contains the following notes: "Told that it was taken care of. D in protective custody of federal gov." Also on the form is the notation "Witness Protection Fed'l."

On March 24, 1993, State Public Defender Goldberg filed a motion in Owens' pending criminal cases, seeking to modify bond. As part of his motion, he stated: "Defendant has proven herself reliable in having served as a witness for the federal government last year. Indeed, it was her understanding that when she went into witness protection these cases would be taken care of."

From here one must confront various interpretations of the facts. Sabrina Owens was never in the Federal Witness Protection Program. Was someone spreading the word that she was, or were some people merely jumping to conclusions? Was there some "deal" between the government and Owens by which the state charges were to be taken care of? Or was it more subtle? Did someone simply get the charges delayed with the hope that they would never resurface? The one charge which was already in the system, the one for which there had been a bench warrant issued, was dismissed at ADA Hanrahan's urging, possibly after talking with Gorecki.

At the motion hearing Owens denied that the government had agreed to "take care of" the state charges. She also said it did not matter to her one way or the other: she never intended to come back to Milwaukee. However, she did come back and she was, as noted, arrested in February 1993. At that time, all of her old state legal troubles resurfaced. And ironically, and quite by coincidence, so did problems for the government in this case.

■ Due process requires that prosecutors disclose evidence that is both favorable to the accused and "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). Material impeachment evidence falls under the *Brady* rule. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

■ A failure to disclose violates *Brady* and *Giglio*, but all such failures do not require that a case be retried. A new trial is not required if the undisclosed matter is "not likely to have changed the verdict." *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968), *quoted in Giglio*. A new trial is required if the false testimony could have affected the judgment of the jury. *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

Rule 33 of the Federal Rules of Criminal Procedure provides that "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice." One basis for relief is that of newly discovered evidence. To achieve relief under this ground in this, a defendant must make a four-part showing:

The defendant must demonstrate that the evidence (1) came to their [sic] knowledge only after trial; (2) could not have been discovered sooner had due diligence been exercised; (3) is material and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a retrial.

*Jarrett v. United States,* 822 F.2d 1438, 1445 (7th Cir.1987), *quoted in United States v. Kamel,* 965 F.2d 484, 490 (7th Cir.1992).

As to the fourth step, "[a] new trial will be granted only if the newly discovered evidence would probably lead to an acquittal in the event of a retrial." *Kamel,* 965 F.2d at 494.

Having considered the evidence presented at the post-trial hearing, I conclude that a few matters require little comment. First, I do not fault the government in any way in connection with the matter regarding the death of Mr. Owens' child back in April of 1991. She received, I find, no benefits from the federal government on that matter. Second, the two misdemeanor matters are of little moment. I chalk up what happened to them to, at best, confusion and the fact that they were not very important. Lastly, the post-trial acts of the government, things like Mr. Cubbie's bail telephone call to ADA Blask, prove nothing. This leaves just the Big Boy matter and its aftermath. On this point, the government comes up short.

The Big Boy incident and the government's role in obtaining a withdrawal of the warrant should have been disclosed. It should have been disclosed under the "open file" policy of the United States Attorney's office in this district and under *Brady* and *Giglio.*

The government concedes that defense counsel might have been able at trial to ask Owens in cross-examination about the Big Boy incident. It contends, however, that the evidence, if admitted, would be merely cumulative. In other words, the government thinks the defense had enough on Ms. Owens to sufficiently call her credibility into question.

The defendants prefer to be able to decide that for themselves, subject to a ruling by the court. In addition, the evidence is not,

the defense says, merely a cumulative attack on Owens' credibility; the "favorable treatment" rendered to Owens is evidence of bias. *United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984).

More than the fact of the Big Boy incident, the lengths to which the government was willing to go to help Owens would have been material evidence. As to the other witnesses discussed in the "Giglio" letter, similar information was set out. As to Gary Petty the letter states, "We have agreed that if Petty substantially assists, we will move for a downward departure from the guideline range." As to Andre Welch, Mr. Lipscomb's letter says, "[t]he DEA recently moved Welch's mother to another apartment at a cost of approximately $1,000." The government was willing to move for a downward departure for Robert Edwards. Crystal Parker "hopes that her cooperation will lead to a favorable recommendation from the federal government when she comes up for parole next year." Why not a statement that Sabrina Owens had a state felony charge pending but that the warrant for it had been withdrawn until the Cross trial was concluded? There should have been a disclosure of this information. But a failure to disclose, as we know, does not mean that a conviction gets set aside.

The problem for the defense is the fourth prong of the rule 33 analysis. I am not convinced that the outcome of this trial would have been different had the matters been fully disclosed. The evidence against each of the defendants is recited in appendix C of the government's memorandum, filed June 24, 1993. I will not repeat it here. In summary, however, Robert Edwards, Andre Welch, and Gary Petty heavily implicated Dwight Johnson in the drug conspiracy charged in the indictment. They all had first-hand drug dealings with him. Search warrants, police surveillance, searches of his person by police, and phone toll analysis also implicated him.

Robert Edwards, Andre Welch, Gary Petty, and Crystal Parker all implicated Reginald Johnson. Search warrants, surveillance, searches of his person by police, phone tolls, and a statement he made to the police

about the amount of money he was making also implicated him.

Robert Edwards, Gary Petty, and Crystal Parker all implicated Cleotha Johnson. Two search warrants also tied him to the conspiracy.

Gary Petty and Crystal Parker both implicated Regina Ramsey. She was also tied to the conspiracy through two search warrants.

Robert Edwards and Andre Welch heavily implicated S.T. Cross. Crystal Parker also testified about him. Real estate documents, phone tolls, and surveillance also tied him to the conspiracy.

Sabrina Owens was a good witness for the government in this case. However, she did not provide all or even a substantial portion of the evidence against these defendants. And, there were lots of ways in which she was impeached. The evidence at trial made her look sufficiently dirty, and more cross-examination on the undisclosed material would not, in my opinion, have made her look much worse. Also, I suspect that the jury was a bit appalled by the fact that the government was paying Ms. Owens a lot of money for doing her deeds. The fact that the federal government also helped get a warrant pulled for her would not have added much to the mix. I will not grant a trial pursuant to rule 33.

The more troublesome aspect of the case is how and why this nondisclosure happened. Lipscomb asked Gorecki to run rap sheets; Gorecki ran them and gave them to Lipscomb without looking at them. Lipscomb went through them looking for dispositions of over one year. He then sent the *Giglio* letter to the defense without saying anything about the Big Boy matter or about the efforts of the government to get the state to pull the arrest warrant for Ms. Owens.

The government's duties regarding disclosure here were vested in Mr. Lipscomb. Did he intentionally decide to withhold *Brady* information from the defense? I don't think he did. Mr. Lipscomb is a talented and competent representative of the government and, to put it as simply as I can, I believe him when he says, under oath, that any omissions from his *Giglio* letter were inadvertent. But with that said, Mr. Lipscomb should know that he probably deserves a tap on the knuckles for being a little too inattentive to his duty in this case under *Brady*. However, with all the headaches that go with putting a case like this together, one must remember that sometimes prosecutors don't always get all the right eggs in all the right baskets. Mr. Lipscomb should, in the future, be more careful when he tells defense attorneys about blemishes on his witnesses and the kind of makeup the government is providing to make those blemishes fade or disappear. All doubts should be resolved in favor of disclosure. A prosecutor will never get in dutch for disclosing too much. When everything is not disclosed, a prosecutor is asking for trouble. Hopefully, that will not happen again.

The motions for post-trial relief are DENIED.

SO ORDERED.