**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Cleotha JOHNSON, Reginald Johnson, also known as Fats, Dwight Johnson, S.T. Cross, Jr., and Regina Ramsey, Defendants–Appellants.**

Nos. 92–3374, 92–3518, 92–3646, 92–3718, 92–3908, 94–1029, 94–1044, 94–1045, 94–1241 and 94–1408.

United States Court of Appeals, Seventh Circuit.

Argued June 10, 1993.

Decided May 31, 1994.

William J. Lipscomb (argued), Office of U.S. Atty., Milwaukee, WI, for U.S. in Nos. 92–3374, 92–3518, 92–3646, 92–3718 and 92–3908.

William M. Binder, Fields & Associates, Brookfield, WI, for Cleotha Johnson.

Brian W. Gleason (argued), Milwaukee, WI, for Reginald Johnson.

Michael J. Fitzgerald, Coffey, Coffey & Geraghty, Milwaukee, WI, for Dwight Johnson.

Thomas G. Wilmouth (argued), Milwaukee, WI, for S.T. Cross, Jr.

Patrick W. Brennan, Riordan, Crivello, Carlson, Mentkowski & Steeves, Milwaukee, WI, for Regina Ramsey.

Joseph R. Wall, Asst. U.S. Atty., Milwaukee, WI, for U.S. in Nos. 94–1029, 94–1044, 94–1241, and 94–1408.

Before POSNER, Chief Judge, ESCHBACH and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

A jury convicted defendants Cleotha Johnson, Reginald Johnson, Dwight Johnson, S.T. Cross, and Regina Ramsey of conspiring to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and § 846 and 18 U.S.C. § 2.[1] Reginald and Regina were also convicted of both possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and using a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) and § 2. Cleotha was sentenced to a term of twenty-five years of imprisonment, to be followed by ten years of supervised release. Reginald and Dwight were both sentenced to terms of fourteen years' imprisonment and five years of supervised release. S.T. was sentenced to a term of 121 months in prison, to be followed by a five-year term of supervised release. Regina was ordered imprisoned for a period of five years as to counts one (conspiracy to possess with intent to distribute cocaine) and nineteen (possession with intent to distribute cocaine), both terms to be served concurrently with each other. As to count twenty (use of a firearm in relation to a drug trafficking offense), Regina was sentenced to five years' imprisonment, to be served consecutively to counts one and nineteen, and was given three concurrent five year terms of supervised release to commence upon release from confinement on count twenty. A $50.00 special assessment was imposed on each defendant for every conviction. The defendants appeal.

On June 3, 1993, a mere seven days prior to oral argument before this court, the defendants filed a Fed.R.Crim.P. 33 motion in the district court seeking dismissal or a new trial based on newly discovered evidence.[2] The motion alleged a *Brady* violation by the Assistant U.S. Attorney for not disclosing all impeachment evidence against a government witness, Sabrina Owens. The trial court held a two-day evidentiary hearing on the motion on August 13 and 17, 1993. On December 21, 1993, the court denied the defendants' motion for dismissal or a new trial, 840 F.Supp. 634. All five defendants filed appeals. At the time these appeals were filed, this panel was prepared to release the decision from the initial appeal but withheld release because the subsequent appeal involved issues similar to the direct appeal and the court believed it was logical to address all the issues in a single opinion. The subsequent appeal was submitted to this panel for resolution on the briefs by order of this court on February 2, 1994 but briefing was not completed until March 21, 1994.

---

1. To facilitate discussion of the appeal, from this point forward we generally shall refer to the five defendants by their first names.

2. The defendants also filed a motion with this court to stay oral argument on the direct appeal pending the outcome of their new trial motion before the district court. We denied that motion and heard oral argument on June 10, 1993.

We affirm each conviction and deny the defendants motion for dismissal or a new trial.

## Background

The five defendants' convictions were the culmination of a joint DEA–Milwaukee Police Department Narcotics Division investigation of Milwaukee cocaine kingpin Kenneth (Ken) Cross. As Milwaukee Police Department Detective Thomas Gorecki, the investigation's "point man,"[3] averred, "Kenneth Cross [was] the leader of a family-centered cocaine distribution network which distributed multi-kilogram quantities of cocaine on a weekly basis and [who] conceal[ed] the indicia or fruits of [his] trade at [his] residences." Cross employed and directed a number of family members and close friends in the drug conspiracy, including each of the five defendants, from at least the beginning of 1987 through the arrest of Ken and his co-conspirators on December 12, 1991. S.T. was Ken's brother, Reginald was his cousin, Regina was one of Ken's several girlfriends, and both Dwight and Cleotha had been his close friends since childhood.

Kenneth's operation was a big-time coke distribution ring. According to the government, Ken alone was responsible for up to 150 kilograms of cocaine between 1987 and 1991. According to the testimony at trial a kilogram of coke sold for between $15,000 and $20,000 in Milwaukee during that period; thus Kenneth dealt between $2,225,000 and $3,000,000 of cocaine from 1987 to 1991. During that same period of time Cleotha, Reginald, and S.T. were also considered to be responsible for up to 50 kilograms of cocaine each. The record is clear that Dwight, Regina, and other co-conspirators not parties to this appeal also sold large amounts of cocaine, but a definitive amount attributable to them is not recited in the record.

Ken and his co-conspirators lived quite lavishly, acquiring a number of recent model luxury cars: a Mercedes–Benz 420 SEL, a Chevrolet Camaro and Corvette, a Ford Mustang 5.0, a Mercedes–Benz 190, a BMW, a Sterling 825 SL–A, an Oldsmobile Toronado, an Isuzu Amigo, and a Ford F–150 Pickup. At the same time, Ken and his co-conspirators also purchased a good deal of real estate consisting of at least sixteen houses and two neighborhood grocery stores. Several of these houses were used to store, process, and distribute cocaine. Not unexpectedly, Kenneth and his co-conspirators took extensive precautions to safeguard these houses from the intrusions of unwanted visitors as well as the police. When police raided one of Ken's drug houses at 3256 North 16th Street, Milwaukee, Wisconsin, for example, they had to go through two doors with four deadbolt locks and other barricades Cleotha had built; once inside, they found a "dump bucket," which is a pail filled with ammonia to expeditiously dissolve cocaine in case of a police raid. Two weeks later, the police raided the house again, and once again encountered a series of barriers built by Cleotha as well as an electronic surveillance eye. The house was raided a third time ten days after the second raid, and the police found a new electronic eye, a new system of locks, and more barricades.

The evidence presented at trial implicating Cleotha, Reginald, Dwight, S.T., and Regina came in large part from Detective Gorecki and other law enforcement agents, as well as from five informant-witnesses who were either former buyers of Kenneth's cocaine or former members of his group who agreed to testify in exchange for reduced penalties. Their testimony painted a portrait of a vast drug operation. As is usual, the first step was to gather the money needed to buy the next supply of cocaine. This was not much of a problem for Ken Cross, for as the kingpin he had a ready supply of cash coming in from previous and current drug sales; if sales were slow, on occasion he borrowed money from others, in particular from Regi-

---

3. Thomas Gorecki is a detective with the Narcotics Division of the Milwaukee Police Department with some twenty years of police experience. He has participated in more than 500 narcotic searches pursuant to warrants during his service. Based on his extensive experience and expertise on the subject of the narcotics trade in Milwaukee, Detective Gorecki was selected and temporarily assigned to the United States Drug Enforcement Agency to lead the investigation of Ken Cross's cocaine ring.

na or Dwight. One of the time consuming tasks facing Ken was the counting of the money; one informant, Crystal Parker, testified that she had assisted Kenneth in counting some $200,000 which was subsequently exchanged for a fresh supply of cocaine. On another occasion a second informant arrived at one of Ken's houses to buy "coke" and found Ken, S.T., and Dwight counting money for their next buy; there was so much money that when the informant left the house some 45 minutes later, Ken, S.T., and Dwight were still counting. After the money was counted and segregated, Ken would usually drive to his Detroit, Michigan source, occasionally accompanied by Regina and/or S.T., to replenish his supply of "coke." And upon his return, Cross delivered the drugs to one of his Milwaukee drug houses. Upon reaching his destination Kenneth would frequently place the cocaine in large roasting pans; one informant testified that he once observed Ken and S.T. with "three roasting pans filled with cocaine," the type of pan "you roast a turkey in." Cleotha and the others helped Kenneth "cut" the cocaine, divide it into smaller quantities, and assist in the re-packaging for resale. Kenneth delegated the responsibility of the selling to Cleotha, Reginald, Dwight, S.T., and Regina, among others, although he also personally continued to sell. When Ken was unavailable, he had Dwight and S.T., whom he trusted, "watch over things" to keep the operation running smoothly. The operation did, in fact, run smoothly; for example, when one particular customer, Robert Edwards, wanted cocaine, Edwards called Kenneth, who directed him to Cleotha, and when Edwards showed up at Cleotha's residence, Cleotha simply opened the door, handed him the ounce of cocaine and collected the amount due, no questions asked. Ken Cross's cocaine distribution conspiracy was so well organized that even when Cross was confined (on unrelated charges) between June 1988 and January 1990, he was able to arrange for uninterrupted service to his customers; on one occasion, for example, he directed Dwight to deliver five ounces of coke to one Andre Welch. During his incarceration, Ken told various individuals that S.T., Reginald, and Dwight were temporarily in charge of the operation, and directed Dwight and S.T. to sell the cocaine to special customers at discounted prices.

As we have said, Ken's and his co-conspirators' illegal activities attracted the attention of both the Narcotics Division of the Milwaukee Police Department and the DEA, which joined forces and launched a full-scale investigation into Ken Cross's vast cocaine distribution ring. The investigation was headed by Detective Gorecki. In his endeavor to gather evidence of the illegal activity, Gorecki lined up several confidential informants who were familiar with and had knowledge of Ken's conspiracy to assist in the investigation. He enlisted their assistance while conducting a series of "controlled" buys during the summer of 1991. Three of these buys occurred at Ken's house on North 23rd Street in Milwaukee, where Reginald occasionally spent the night. Gorecki's investigation of Ken Cross's cocaine ring provided the detective with the necessary information to obtain search warrants for five of Ken's Milwaukee houses, including the N. 23rd Street property. The evidence seized and information gained as a result of the searches gave the office of the United States Attorney for the Eastern District of Wisconsin evidence sufficient to present a case to a grand jury.

The grand jury handed down a 20–count indictment, and thereafter a superseded indictment. Count one charged "[t]hat on or about January 1, 1987, to on or about December 11, 1991," Ken, Dwight, Reginald, Cleotha, Regina, S.T., Gary Petty, Robert Wheeler, and Billy Ray Griffin "did knowingly and intentionally conspire between themselves and with persons known and unknown to the grand jury to possess with intent to distribute in excess of five (5) kilograms of cocaine[.]" The remaining counts charged substantive cocaine and firearm violations against the various defendants, and the indictment included a forfeiture provision.[4]

4. The indictment provided for the forfeiture of automobiles (a 1986 Mercedes–Benz 420 SEL, a 1991 Oldsmobile Toronado, a 1989 Chevrolet Camaro, a 1989 Isuzu Amigo, and 1986 Chevro-

let Corvette, a 1989 Ford Mustang 5.0, a 1985 Mercedes–Benz 190, a 1983 BMW, a 1988 Ford F–150 Pickup, and a 1987 Sterling 825 SL–A) and Milwaukee real property (3007 N. 20th St.,

The next day, December 12, 1991, the police arrested Ken, Cleotha, Dwight, Reginald, S.T., and Regina, and other members of the conspiracy, including Gary Petty, Robert Wheeler, Gary Ramsey (Regina's brother), and Billy Ray Griffin.

Kenneth, Petty, and Wheeler entered pleas of guilty to the indictments before trial, while Billy Ray Griffin pled guilty after the conclusion of the five defendants' trial. Gary Ramsey's case was dismissed on the government's motion. Cleotha, Reginald, Dwight, S.T., and Regina went to trial on June 29, 1992. After two weeks of trial and the testimony of 31 witnesses, the jury convicted each of the defendants on each of the counts pertaining to them individually as set forth in the indictment. Each of the defendants appeals his/her conviction(s).

## I. Reference to the Guilty Plea of Kenneth Cross, a Non–Testifying Co–Defendant

Cleotha, Reginald, Dwight, and Regina contend that the references made during opening arguments to the fact that Kenneth Cross had already pled guilty were so prejudicial as to entitle them to a new trial. The government responds that each of the defendants assented to the referral to the respective pleas of guilty to the defendants who pleaded, including Ken's guilty plea, during a recorded discussion with the court held outside the presence of the jury and prior to opening statements.

### A.

Prior to the trial of the five defendants before us, three of the nine defendants named in the superseding indictment pled guilty: Kenneth, Gary Petty, and Robert Wheeler. A fourth individual, Robert Edwards, also pled guilty before trial on a related but separate charge of possession of cocaine with intent to distribute. Petty's and Edwards's names appeared on the government's witness list and both testified at the trial of Cleotha, Reginald, Dwight, S.T., and Regina. On the other hand, Ken Cross's and

Wheeler's names failed to appear on the witness list because neither the prosecution nor any of the defense counsel intended to call them to the witness stand.

All five defendants were represented by separate counsel. Prior to opening statements, counsel for S.T. made the following inquiry of the court:

> [Counsel for S.T.]: Yes, Judge. I have an inquiry for guidance purposes during the course of opening statements of what references we can make about those defendants who have disposed of their case and/or those defendants who have been severed out.
>
> The Court: Well, I guess you let your conscience be your guide on what to say about that. It's certainly going to be, if any of these people who have pled out are going to testify as witnesses for the government you can drag that out if you think it will help you.
>
> [Counsel for S.T.]: I was just concerned. I was going to do something, yeah. We are not precluded from mentioning dispositions?
>
> The Court: No, not at all.

Record at 8–9. Following the court's "No, not at all" response, the topic of discussion moved on to an unrelated matter. None of S.T. Cross's four co-defendants voiced an objection to S.T. Cross's counsel's stated intention of "mentioning dispositions."

Although the prosecution's opening argument focused on each defendant's relationship to Kenneth Cross, the prosecution did not mention Ken Cross's plea to the charges against him. Counsel for Dwight Johnson began his opening argument, stating, "Ladies and gentlemen of the jury. Kenny Cross. Kenny Cross. Kenny Cross. A name you've heard a lot of already. A name you are going to hear a lot of in the course of this trial[,]" but he likewise did not mention that Kenneth had pled guilty.

S.T.'s counsel was the second of the five defense attorneys to present an opening ar-

3607 N. 13th St., 3007 N. 24th St., 2147/2149 N. 36th St., 3704 N. 4th St., 3418 W. Hadley St., 3023 N. 22nd St., 3023/3025 N. 25th St., 2571/2573 N. 35th St., 4620 N. 28th St., 2958 N.

23rd St., 4462 N. 37th St., 3023 N. 18th St., 3077/3079 N. 25th St., 2567 N. 37th St., 1538 N. 33rd St., 1742 N. 35th St., and 3410 N. 2nd St).

gument. In keeping with the district court's response to his inquiry about "mentioning dispositions," counsel informed the jury that Edwards and Petty, both of whom were on the government's witness list, had pled guilty and would testify for the prosecution. In addition, S.T.'s counsel joined the "Kenny Cross, Kenny Cross, Kenny Cross" theme as his theory of defense, and also mentioned on several occasions that Ken Cross and Robert Wheeler, two co-defendants whose names did not appear on the government's witness list, had, as counsel put it, "gone down for the count." As counsel for S.T. informed this court at oral argument, one of his strategies was to play to the jury's sympathies: since Kenneth, the "big fish," who was the target of the investigation, had already been landed, the little fish, like his client S.T., ought to be let go. Although Cleotha, Reginald, Dwight, and Regina now complain that the references to Kenneth Cross's guilty plea were so prejudicial as to entitle them to reversal, apparently none were paying attention, as they must, for not one of the other four defense attorneys timely objected to the references to Ken Cross's or Wheeler's guilty pleas.

Counsel for Reginald was next in line to present his opening statement. Midway through his argument, counsel followed S.T.'s attorney's lead and remarked, "Now, other people before me have talked a little bit about evidence. So let's talk a little bit about evidence. You know, Kenny Cross pled guilty in this case. Kenny Cross had a good case, the government put together a good case against Kenny Cross." Once again, none of the defense counsel objected on behalf of their clients to the mention of Cross's guilty plea. When Regina's and Cleotha's attorneys presented their opening statements, neither of them made reference to any of the guilty pleas.

On the second day of trial before taking any testimony, outside the presence of the jury, the attorneys for Cleotha, Dwight, and Regina moved the court for a mistrial based on the references to Ken Cross's guilty plea. Counsel for S.T. and Reginald did not join in the objection. The district court denied the

motion for mistrial. Counsel for Cleotha, Dwight, and Regina also moved for a severance on the basis of the mention of Ken's guilty plea, arguing that it had become "difficult ... to assert that a conspiracy did not exist in the first instance with the jury knowing that Mr. Cross, the key player, has essentially said it did." The trial court took the severance motion under advisement and later denied it.[5] After the objection and request for a mistrial had been overruled, none of the defense attorneys again raised the issue of the references to Ken's guilty plea throughout the duration of the trial. Not one of the attorneys requested the court to give a cautionary instruction to the jury advising them that a co-defendant's guilty plea may not be used as substantive evidence of another defendant's guilt. During the course of trial Petty and Edwards both testified and were cross-examined about the circumstances surrounding their guilty pleas, but Kenneth's and Wheeler's guilty pleas were never mentioned again.

Notwithstanding the defendants' lack of concern for rectifying the alleged problem of the mention of Ken Cross's guilty plea, the district court issued a series of final instructions to the jury designed to alleviate any alleged harmful effect caused by the mention of Ken's guilty plea. Among the instructions given was the following:

> *What the attorneys have said during the course of the trial and what they will say in their arguments to you, those statements are not evidence and may not be considered by the jury as evidence.... It is what the witnesses have said that's the evidence in this case.... But what the attorneys say is not evidence.*

The instructions dissipated the risk that the jurors would be improperly influenced by S.T.'s and Reginald's attorneys' references to Kenneth's guilty plea for we rely on our belief that juries heed the instructions they have been given. *United States v. Severson*, 3 F.3d 1005, 1015 (7th Cir.1993).

5. After the initial motion for severance, the defense attorneys never again referred to the issue

of severance during the trial nor have they raised the issue on appeal.

**B.**

Cleotha, Reginald, Dwight, and Regina contend they were harmed by the references made during opening arguments to the fact that Ken Cross had pled guilty. The government responds that based on the discussion between counsel for S.T. and the district court in the presence of the other four defense counsel, the defendants assented to the reference to Kenneth's guilty plea and therefore may not raise the issue on appeal. In answer to the government's response, the defendants claim that the district court's reply to S.T.'s attorney's inquiry was limited to the mention of testifying co-defendants' guilty pleas. Cleotha, Reginald, Dwight, and Regina argue that although they may have assented to mention of guilty pleas of those co-defendants who were going to testify (Edwards and Petty), they did not assent to the mention of guilty pleas of those co-defendants who were not going to testify (Ken and Wheeler).

S.T. concedes that he cannot claim he was harmed by the mention of Ken's guilty plea on appeal because he mentioned Ken's guilty plea to the jury. Additionally, we observe that like counsel for S.T., Reginald's attorney also mentioned to the jury the fact that Ken Cross pled guilty. A party may not "invite" error and then argue on appeal that the error for which he was responsible entitles him to relief. *United States v. Muskovsky,* 863 F.2d 1319, 1329 (7th Cir.1988), *cert. denied sub nom. Posner v. United States,* 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989). Because Reginald's counsel mentioned Ken's guilty plea at trial, Reginald may not argue on appeal that the mention of the guilty plea prejudiced him. *See Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 2647–48, 91 L.Ed.2d 397 (1986) (rejecting argument that it was inappropriate to hold defendant to the errors of his attorney); *Bateman v. United States,* 875 F.2d 1304, 1307 (7th Cir.1989) (noting defendant is typically bound by his competent counsel's decisions).

It is established that the guilty plea of a co-defendant may not be used as substantive evidence of another defendant's guilt. *United States v. Austin,* 786 F.2d 986,

991 (10th Cir.1986); *United States v. Baez,* 703 F.2d 453, 455 (10th Cir.1983); *United States v. Halbert,* 640 F.2d 1000, 1004 (9th Cir.1981). As the district court correctly stated in response to S.T.'s attorney's query, however, testifying co-defendants' guilty pleas may be introduced into evidence for the limited purpose of assessing the witness's credibility. *United States v. Bryza,* 522 F.2d 414 (7th Cir.1975), *cert. denied,* 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). The concern raised by the mention of a co-defendant's guilty plea is that after a jury learns that one co-defendant has admitted guilt, it may possibly infer that the defendant on trial is more likely to be guilty, as well. *Baez,* 703 F.2d at 455. It is generally accepted that absent agreement, "courts and prosecutors generally are forbidden from mentioning that a co-defendant has either pled guilty or been convicted." *United States v. Griffin,* 778 F.2d 707, 710 (11th Cir.1985). This general principle, of course, gives way when the evidence against the defendant(s) is so overwhelming that any error is rendered harmless beyond a reasonable doubt. *E.g., United States v. Blevins,* 960 F.2d 1252, 1262–63 (4th Cir.1992).

Despite precautions, occasionally a reference is made to a non-testifying co-defendant's guilty plea (whether careless or as part of a planned trial tactic). When this happens, those who deem the remark as unwelcome should make a timely and specific objection, in order that the court has the opportunity to rectify the error, if indeed there has been error, at the time. *See United States v. Lewis,* 954 F.2d 1386; 1391 (7th Cir.1992). An objection raised some time after the alleged error has occurred and after the opportunity to address the error has passed obviously defeats the purpose of the requirement of timeliness. In addition to being timely, the objection must also specify the precise nature of the alleged error; simply saying, "I object" is insufficient to apprise the court of the alleged error. *See United States v. Wynn,* 845 F.2d 1439, 1442 (7th Cir.1988). Likewise, defense counsel is well-advised to request a prompt cautionary instruction from the trial court. *Blevins,* 960 F.2d at 1260 ("[i]f for whatever reason the

jury does learn that co-defendants have pleaded guilty, the court upon request should issue a limiting instruction to jurors stating that the evidence of such guilty pleas is not to be taken as substantive evidence of guilt of the remaining defendants"); *see Halbert,* 640 F.2d at 1006. In this case, none of the four defendants objected when, prior to opening argument, counsel for S.T. addressed the court and stated his intention of "mentioning dispositions." (Most likely the failure to object was because mentioning dispositions was the theory of defense for the other defendants: the "big fish" has been caught therefore let the little fish go). Likewise none of the defendants timely objected when the references to Kenneth's guilty plea were made, but after having second thoughts, objections were finally raised the next day and overruled by the court. Even at that time, however, not one of the defendants requested that the court give a prompt cautionary instruction.

Because counsel for Cleotha, Dwight, and Regina were present and raised no objection when counsel for S.T. on the record received permission from the court to mention the guilty pleas of the two testifying co-defendants, Petty and Edwards, without doubt Cleotha, Dwight, and Regina were on notice of and impliedly assented to the mention of testifying co-defendants' guilty pleas. The question presented to us by the government is, under all the circumstances, whether Cleotha, Dwight, and Regina were all reasonably put on notice of S.T.'s counsel's intent to mention the guilty plea of Kenneth, a non-testifying co-defendant?

The government's argument is that because Kenneth Cross was at the hub of the government's case, as well as at the center of each theory of defense to the conspiracy charge (each defense attorney argued that although his respective client knew Kenneth, the defendant did not conspire with Cross to distribute cocaine), and because the district court's response to S.T.'s attorney's inquiry did not expressly preclude mention of Ken's guilty plea, the defense attorneys should

have lodged an objection to S.T.'s stated intention of "mentioning dispositions," or at least asked the court for a clarification as to whether the court's response to S.T.'s inquiry also applied to non-testifying co-defendants like Ken Cross. We need not resolve this argument that Cleotha, Dwight, and Regina agreed that S.T. could mention Kenneth's guilty plea to the jury, because after considering the totality of the evidence, the references to Kenneth's guilty plea were harmless, as explained below.

### C.

■ We initially observe that Cleotha, Dwight, and Regina failed to make a timely, specific objection to the references to Kenneth's guilty plea made during opening arguments, and have thus forfeited the right to allege error on appeal based on the mention of the guilty plea.[6] As our Supreme Court recently stated in *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993), " '[n]o procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it'[,]" (quoting *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 677, 88 L.Ed. 834 (1944). By failing to timely object when the references to Ken Cross's guilty plea were made, the defendants forfeited the right to predicate error on the passing references to Ken Cross's guilty plea by their co-defense attorneys in the opening statements. *See Olano,* —— U.S. at —— – ——, 113 S.Ct. at 1776–77. The defendants have only themselves to blame for this failure to timely object.

■ Normally a defendant's failure to make a timely assertion of his rights triggers a plain error analysis under Fed.R.Crim.Pro. 52(b). The government, however, has not argued that the defendants forfeited their rights by failing to make a timely and specif-

---

**6.** Reginald also failed to object to S.T.'s attorney's mention of Ken's guilty plea and like Cleotha, Dwight, and Regina, has forfeited (waived) the right to raise the issue on appeal. In addition, as stated above, Reginald also invited error by making reference to Ken's guilty plea. Thus Reginald's appeal can be denied on either of two grounds: invited error, and forfeiture.

ic objection, request admonitions, and submit curative jury instructions concerning the mention of a non-testifying co-defendant's guilty plea, leaving us to assess the defendants' argument on the merits "without the screen of the plain error standard." *United States v. Leichtnam,* 948 F.2d 370, 375 (7th Cir.1991); *United States v. Malin,* 908 F.2d 163, 167 (7th Cir.); *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990). Nevertheless, we are convinced that when considering the totality of the record before us the mere mentioning of Kenneth Cross's guilty plea by the two defense attorneys in the opening statements of the two week trial was harmless beyond a reasonable doubt. *See Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993) (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *Blevins,* 960 F.2d at 1262–64. In *Blevins,* the Fourth Circuit held that despite three references to non-testifying co-defendants guilty pleas during the course of the trial (by the judge, the prosecutor and a government witness), the error was harmless beyond a reasonable doubt because the evidence of the defendants' guilt was "overwhelming." 960 F.2d at 1263–65. In the case before us, we reach the same conclusion as the *Blevins* court for the following reasons.

Initially, we hasten to point out that the references to Ken Cross were relatively innocuous in that they occurred solely during the opening statements of a trial that produced nearly 1500 pages of testimony. Not one of the testifying witnesses mentioned that Ken had pled guilty and the subject never arose again during the trial. The fact that the guilty plea was not even referred to after the first afternoon makes it less than likely that the jury considered the remarks. *See United States v. Keskey,* 863 F.2d 474, 480 (7th Cir.1988).

Secondly, the court instructed the jurors that they had *"a sworn duty, an obligation to be fair and to be impartial to all sides here and to base your ultimate decision or decisions in this case on the evidence that has been presented during the course of the trial."* (Emphasis added). The court then advised the jury that *"[t]he defendants are*

*presumed to be innocent and may not be found guilty on any count by the jury unless the jury is convinced beyond a reasonable doubt that the defendant has been proven guilty."* (Emphasis added). The court next instructed the jury that

> You will decide the case based on the evidence. And the evidence consists of the sworn testimony that was given by witnesses during the trial, the exhibits that have been received and identified during the course of the trial, the stipulations, that is, the agreements that were announced to you by the attorneys. That's the evidence in this case.

> You notice I did not include in my definition of evidence statements of the attorneys. What the attorneys have said during the course of the trial and what they will say in their arguments to you, those statements are not evidence and may not be considered by the jury as evidence ... it is what the witnesses have said that's the evidence in this case ... but what the attorneys say is not evidence.

Additionally, the trial judge advised the jury that *"the guilty pleas of [Petty and Edwards] are not to be considered in any way as evidence against these defendants."* (Emphasis added). Finally, the judge reminded the jury that *"[t]he burden of proof rests with the government. The government has the burden of proving guilt beyond a reasonable doubt. The defendants are not required to prove their innocence to you."* *See Blevins,* 960 F.2d at 1260–61 (holding reference to nontestifying co-defendants' guilty pleas was harmless error despite failure of court to give specific limiting instruction regarding nontestifying co-defendants).

Aside from the jury instructions, the evidence that Cleotha, Dwight, and Regina were guilty of the crimes with which they were charged is overwhelming. Not only was the evidence of guilt of each and every element of each and every crime charged proved beyond a reasonable doubt, but not one scintilla of evidence against the defendants has been challenged through contradictory testimony—the only challenges to the defendants' guilt were via the vehicle of cross-examination. On the other hand, in the interest of

fairness, we must point out that the three defense attorneys had little to work with, for the evidence against their clients was overwhelming. For example, the evidence was uncontradicted that Cleotha helped Kenneth "cut" the cocaine, divide it into one-ounce quantities, and package the drug for sale, sell the drug, and count the money. Crystal Parker testified that Cleotha sold cocaine he received from Kenneth to her on thirty or forty occasions, and that Cleotha built fortifications inside one of Kenneth's drug houses. Edwards testified that one time when he wanted an ounce of cocaine he called Kenneth, who directed him to Cleotha, who merely handed the cocaine to Edwards and collected the money without asking any questions. Kenneth told others that while he was in jail, Cleotha assisted in the operation. Dwight likewise sold cocaine for Kenneth and when Kenneth was confined, Dwight managed the operation because Ken considered him trustworthy. At Ken's direction, Dwight gave discounted prices to valued customers. Dwight delivered five ounces of cocaine to Andre Welch on Kenneth's behest while Kenneth was incarcerated, and returned two days later to pick up the money. On at least two occasions Welch bought two ounces of cocaine from Dwight after being directed to Dwight by Ken. When Welch tried to leave the cocaine ring, Dwight, among others, pressured Welch to remain. And as we will discuss in greater detail, Regina, like Cleotha and Dwight, also distributed and sold cocaine for Kenneth. She accompanied Kenneth to his Detroit supplier, and, like Dwight, loaned Kenneth cash in order that he might replenish his temporarily depleted drug supply. When the police searched Regina's house, they found eighteen ounces of cocaine and her handgun in her safe.

Looking at the facts, circumstances, and evidence surrounding this two week trial in their totality, and after considering the 1500 pages of testimony of 31 witnesses, we conclude that the evidence against each of the defendants named in the indictment was overwhelming. We refuse to accept the argument that the mere mention of Ken Cross's guilty plea by the respective co-coun-

sel in opening argument had any influence on the guilty findings of the defendants who went to trial before the jury. We also reject the defendants' argument that the mention of Ken Cross's guilty plea to the conspiracy charge in the opening statements of two of the defense attorneys relieved the government of having to prove the existence of the conspiracy. Considering the fact that neither the government, nor the defense attorneys, nor the court referred to the guilty plea after the opening statements, it is ridiculous to suggest that the prosecutor was relieved of his duty of presenting proof beyond a reasonable doubt that each and every defendant was guilty of each and every element of the charged conspiracy. In fact, the prosecutor presented overwhelming evidence (1) that the conspiracy existed, (2) that each defendant was a participant, and (3) that overt acts were committed in furtherance of the conspiracy. When the evidence of guilt against the defendants is overwhelming, it is highly unlikely that references in an opening statement to a co-defendant's guilty plea will have any effect on the outcome. *Blevins,* 960 F.2d at 1263–65; *cf. Baez,* 703 F.2d at 456 (mention of non-testifying co-defendant's guilty plea made by judge; "the evidence was so far from overwhelming that the judge's prejudicial remarks could well have affected the outcome of the trial" and tipped the scale). As the Tenth Circuit stated in *United States v. Williams,* 445 F.2d 421, 424 (10th Cir.), *cert. denied,* 404 U.S. 966, 92 S.Ct. 342, 30 L.Ed.2d 286 (1971), and as is the case here, "the evidence is so one-sided that it is inconceivable that [correction of the mention of the guilty plea] would have had any influence on the judgment of the jury or affected the result."

Because the references to Kenneth's guilty plea were made in passing only during the opening statements of a two week trial, because the court's jury instructions dissipated the risk that the jurors would be improperly influenced by the passing mentions of Ken's guilty plea, and because the evidence against the defendants was overwhelming, we conclude that the references to Ken's guilty plea were not prejudicial to the defendants.[7]

---

**7.** The four defendants correctly observed that

*Baez* and *Austin* have commented that "[t]he

## II. Newly Discovered Evidence

The defendants filed two separate motions for a new trial based on Fed.R.Crim.P. 33. The first motion was filed immediately following the July 1992 trial and the second motion was filed on June 3, 1993. We address the trial court's denial of these two motions in turn.

At trial, Sabrina Owens was queried as to why and how she became involved as a government informant and ultimately a witness. She answered that after a fistfight with her drug-dealing boyfriend she had called the police for protection. During her contact with the police, she became aware that her boyfriend was already under investigation, and when the police offered her inpatient treatment at a drug rehabilitation facility, relocation, and 18–25% of seized assets,[8] she agreed to work as an informant in the Cross investigation. Over the defendants' protestations, the jury was not admitted to learn that on May 11, 1991, at approximately the time she agreed to act as an informant in the Cross investigation, Owens was under arrest for the crime of first degree homicide of her 10–week old daughter.

Immediately following the return of the jury's guilty verdicts, the five defendants filed a Fed.R.Crim.P. 33 motion for a new trial based on newly discovered evidence— specifically, "Sabrina Owens's potential involvement in the homicide of her daughter." Prior to trial, the defendants' attorneys had in their possession a Milwaukee Police Department "rap sheet" referencing the fact that Sabrina Owens had been arrested for first degree homicide on May 11, 1991. The district court denied the motion for a new trial, finding that because the defendants had knowledge of Owens's arrest for the suspected homicide of her infant daughter before trial, they had discovered nothing they did not previously have knowledge of, and thus the information could not be classified as newly discovered evidence. The five defendants continue to argue for a new trial, for in their opinion Owens's testimony would have been severely undermined if the jury knew she testified in order to try to escape a trial for the alleged homicide of her daughter.

We review the decision to grant or deny a motion for a new trial on the basis of newly discovered evidence under an abuse of discretion standard. *United States v. Kamel,* 965 F.2d 484, 490 (7th Cir.1992). To justify the grant of a new trial on the basis of newly discovered evidence (Fed.R.Crim.Pro. 33), the defendants must demonstrate that the evidence 1) came to their attention only after trial, 2) could not have been discovered sooner had due diligence been exercised, 3) is material and not merely impeaching or cumulative, and 4) would probably lead to an acquittal in the event of a retrial. *Id.* (citing *Jarrett v. United States,* 822 F.2d 1438, 1445 (7th Cir.1987)).

The defendants' argument fails. The defendants concede they knew before trial that Owens had been arrested for the death of her child, thus failing to satisfy the requirement that the evidence be unknown to them before or at trial. Moreover, their argument that Owens's credibility would have been severely undermined ignores the third requirement of the *Kamel* test that the evidence must be material and not merely impeaching. Finally, counsel ignore the fact that Owens was certainly not the single source of evidence of the defendants' guilt.

admission of guilty pleas or convictions of co-defendants not subject to cross-examination is generally considered plain error." In *Baez,* no objection was raised to the judge's mention of a non-testifying co-defendant's guilty plea. The court reversed the conviction and observed that "the evidence was so far from overwhelming that the judge's prejudicial remarks could well have affected the outcome of the trial." *Baez,* 703 F.2d at 456. In contrast with *Baez,* the evidence in this case is most convincing and overwhelming. In *Austin,* also a case in which no timely objection was raised, the court noted that while the evidence against the two defendants was "ad-

equate ... it was far from overwhelming." *Austin,* 786 F.2d at 992. *Because the evidence of guilt in this case is, in fact, overwhelming, these two cases are certainly distinguishable and fall far short of being convincing.*

8. This strikes us as being a most unusual and an overly generous compensation to be paid to an informant. But the five defense attorneys advisedly missed no opportunity in suggesting to the jury that Owens's credibility might very well have been influenced by the large sums she stood to gain from the deal she struck.

**682**

Therefore, the district court did not abuse its discretion in denying the motion for a new trial based on the allegedly newly discovered evidence of Sabrina Owens' involvement in the homicide of her daughter.[9]

Secondly, we address the defendants' new trial motion, filed with the trial court on June 3, 1993, regarding the government's failure to disclose its participation in delaying/dismissing three separate state charges against Owens (strong-arm robbery and two misdemeanor thefts). Following a two-day evidentiary hearing, the district court found that the government *should have* disclosed the fact that it requested the state prosecutor to delay filing strong-arm robbery charges against Owens until after she testified at the Cross trial in July 1992. The court found that although the government should have produced this evidence for the defendants pursuant to its "open file policy" and pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as well as *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the failure to disclose the evidence did not warrant a new trial because under the fourth prong of the *Kamel* test, the court was "not convinced that the outcome of [the] trial would have been different had the matters been fully disclosed." *United States v. Johnson,* at 640. The court summarized the overwhelming evidence against the defendants and explained that while "Sabrina Owens was a good witness for the government in this case ... she *did not provide all or even a substantial* portion of the evidence against these defendants." *Id.* at 641. Following the trial court's final order denying the motion for a new trial on December 21, 1993, each of the defendants (several weeks apart) appealed to this court. We withheld release of the decision on the direct appeal in order to include the subsequent appeal from the denial of the new trial. We were unable to begin deliberation on the subsequent appeal until briefing was completed on March 21, 1994. As stated above, we review the trial court's refusal to grant a new trial under the abuse of discretion standard. *United States v. DePriest,* 6 F.3d 1201, 1216 (7th Cir.1993) ("We shall reverse a district court's denial of a motion for a new trial based on newly discovered evidence only if the district court has abused its discretion.... We approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury.") (Citations omitted).

The defendants, in their reply brief, acknowledged "that they are in agreement with the District Court and the government that the disclosure of the subject *Brady* and *Giglio* material would probably not lead to a different result at trial." Reply Brief at 2. The defendants, however, assert that we should dismiss the case or grant a new trial based on our supervisory power to prevent a miscarriage of justice resulting from the government's intentional or negligent failure to disclose its role in dismissing/delaying three state charges against a government witness. In *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983), the U.S. Supreme Court explained the purpose and scope of a federal court's supervisory powers:

"'[G]uided by considerations of justice,' ... and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights, ... to preserve judicial integ-

9. Contrary to the circuit's long line of cases making it crystal clear that a defendant is required to make the four-part showing recorded in *Kamel,* the defendants here contend, in an exercise of futility, that the district court employed the "wrong test" for assessing their motion. They claim that because they filed their motion within seven days of the verdict, the four requirements listed in *Kamel* need not be considered. They support their argument with an Eleventh Circuit case, *United States v. Hall,* 854 F.2d 1269 (11th Cir.1988), that states, "[f]or motions filed within seven days, a court has very broad discretion in deciding whether there has been a miscarriage of justice." *Id.* at 1271. We have two comments. First, even if *Hall* stood for the proposition that defendants claim it does (that is, newly discovered evidence need not be newly discovered), a proposition with which we disagree, it is not the law of this circuit. Second, even if the standard were severely relaxed, the defendants have failed to establish the district court's decision amounted to an abuse of discretion.

rity by ensuring that a conviction rests on appropriate considerations validly before the jury, ... and finally, as a remedy designed to deter illegal conduct....

\* \* \*

To the extent that the values protected by supervisory authority are at issue here, these powers may not be exercised in a vacuum. Rather, reversals of convictions under the court's supervisory power must be approached "with some caution," ... and with a view toward balancing the interests involved....

*Id.* at 505–07, 103 S.Ct. at 1979 (citations omitted).

■ While it may be an appropriate use of the court's supervisory power to curb prosecutorial misconduct, *see, e.g., United States v. Osorio*, 929 F.2d 753 (1st Cir.1991); *United States v. Owen*, 580 F.2d 365, 367 (9th Cir.1978), and we would not hesitate to invoke it if we were convinced the factual situation was meritorious, such an extreme sanction would be inappropriate in this instance as the conviction would have been obtained notwithstanding the failure to disclose the exculpatory evidence. *Hasting,* 461 U.S. at 506, 103 S.Ct. at 1979 (holding that a court may not exercise supervisory power to reverse a conviction if the error necessitating the reversal was harmless). As we have stated above, Sabrina Owens' testimony was not the sole evidence against these five defendants. The testimony of Robert Edwards, Andre Welch, Crystal Parker and Gary Petty, as well as police surveillance, telephone toll records, and evidence obtained by the police pursuant to search warrants implicated each of the defendants. Moreover, Sabrina Owens was thoroughly cross-examined and impeached by the respective defense counsel. Counsel exposed the fact

that she had a bias [10] in favor of the government because she was a paid informant [11] and expected to receive a substantial share (18–25%) of any forfeited property of the drug conspirators. Additionally, it was made known to the jury that she was a cocaine user during the time of her participation in the investigation, she skimmed the DEA's drug "buy" money for her own use, she sold drugs for her own profit, and she had sexual intercourse on two occasions with the target of the investigation (Kenny Cross). We are of the opinion that this evidence exposing not only her lack of character but also her potential for being partial toward the government thoroughly impeached the witness and thus the government's failure to timely disclose that it had a role in dismissing/delaying three pending state charges would not have made her any less credible than she already was. We hold that the district court did not abuse its discretion in denying the motion for a new trial and we refuse to exercise our supervisory powers to correct the government's failure to disclose the additional *Brady/Giglio* material.

That said, we, like the trial court, express our concern over the government's handling of this case and expect to see greater attention paid to *Brady/Giglio* disclosures in the future. In the future, we will not hesitate to order a new trial if the government fails to make timely disclosure of all *Brady/Giglio* material. Having addressed the two allegations of error common to all defendants, we now turn to the issues raised individually by Regina, S.T., and Reginald.

### III. Regina Ramsey

Regina was convicted of conspiracy to possess cocaine with intent to distribute, possession of cocaine with intent to distribute, and use of a firearm in relation to a drug traffick-

---

**10.** The Supreme Court has defined the "bias" of a witness as follows:

"Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."
*United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984).

**11.** As of the time of trial, the government had paid Owens $8,000 for her role as an informant and paid for a one-month drug treatment program.

ing offense. She contends the evidence is insufficient to support any of her convictions.

### A.

When considering a challenge to the sufficiency of the evidence, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Reversal is warranted "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Gutierrez*, 978 F.2d 1463, 1468–69 (7th Cir.1992). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 318, 99 S.Ct. at 2789–90.

### *Regina's Conspiracy to Possess Cocaine with Intent to Distribute Count*

■ A conspiracy is defined as "a combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *Id.* at 1469. In other words, a conspiracy is "an agreement to commit a crime." *United States v. Lechuga*, 994 F.2d 346, 348 (7th Cir.) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). To prove a conspiracy, the government must demonstrate that 1) there was an agreement between two or more persons to commit an unlawful act, 2) that the defendant was a party to the agreement, and 3) that an overt act was committed in furtherance of the agreement by one of the co-conspirators. *United States v. Olson*, 978 F.2d 1472, 1478 (7th Cir.1992) (citing *United States v. Navarez*, 954 F.2d 1375, 1380 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993). "When the sufficiency of the evidence to connect a particular defendant to a conspiracy is challenged on appeal, substantial evidence should be the test rather than slight evidence or slight connection."

*Olson,* 978 F.2d at 1479 (quoting *United States v. Durrive,* 902 F.2d 1221, 1228 (7th Cir.1990)).

■ The evidence supporting Regina's conspiracy conviction is more than substantial. Parker testified that Kenneth Cross had informed her that Regina was selling cocaine for him. Parker also related how Regina had accompanied Ken to Detroit to pick up a supply of cocaine. Gary Petty testified that he purchased cocaine from Ken at Regina's house and in Regina's presence. He also recounted how on occasion both Regina and Dwight loaned money to Ken Cross to purchase a new batch of coke. The evidence adduced at trial plainly demonstrates that there was an agreement between Kenneth, Regina and others to commit an unlawful act, that Regina was a party to the agreement, and that an overt act (selling cocaine) was committed in furtherance of the agreement by one of the co-conspirators. Because substantial evidence was presented at trial with which a jury could find beyond a reasonable doubt that Regina conspired to possess cocaine with the intent to distribute it, we affirm Regina's conviction for conspiracy.

### B.

Regina's convictions for possessing cocaine with intent to distribute and using a handgun in relation to a drug trafficking crime were based on the results of a search of the house she resided in at 3023 N. 18th Street. Regina contends this evidence is insufficient to sustain her two convictions for possession of cocaine with intent to distribute and for using a firearm during and in relation to a drug trafficking offense.

### *Regina's Possession of Cocaine with Intent to Distribute Count*

■ "In order to demonstrate possession of cocaine, it is sufficient that the government show a level of control that meets the standard of 'constructive possession'." *United States v. Martinez*, 937 F.2d 299, 305 (7th Cir.1991). Although "mere association with those who possess drugs is not enough" to sustain a possession conviction, "[a] person can be convicted for possessing cocaine

though he does not possess it in a literal sense." *United States v. Moya–Gomez,* 860 F.2d 706, 756 (7th Cir.1988), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). To establish constructive possession of cocaine, the government must put forth evidence demonstrating ownership, dominion, or control over the contraband. *Id.* at 756.

■ When viewed in the light most favorable to the government, the evidence produced at trial established Regina constructively possessed cocaine with the intent to distribute it. Sabrina Owens had made a controlled buy of an ounce of cocaine from Regina at the 18th Street address on October 30, 1991, the day before the search of Regina's house, and observed that Regina had used a key to enter the building. While searching her 18th St. residence pursuant to a search warrant, DEA agents found a safe containing eighteen ounces of cocaine, packaging materials, and a loaded .25 caliber handgun. A registration check revealed that Regina had lawfully purchased and registered the gun in her name some three and one-half years earlier. On the floor next to the safe the DEA agents found a strongbox, too large to fit in her safe, containing Regina's personal papers. Gary Petty testified that immediately following the search of Regina's 18th Street home, he found Regina weeping, and in response to his inquiry, she said her house had been raided. Additional evidence was presented that Regina had been arrested at the 3023 N. 18th Street address in February of 1989, and at that time had admitted that the residence was hers. Although it is true that papers belonging to persons other than Regina were also found during the search and also that some of Regina's papers found in the strongbox indicated Regina resided elsewhere at the time of the search, it is not our responsibility to weigh conflicting evidence; that is the duty of the jury alone who weighed the evidence and found credible the testimony offered in the government's case that she resided at 3023 N. 18th St.

When considered in the light most favorable to the government, the evidence produced at trial demonstrated Regina's ownership, dominion, and control over the cocaine found in her safe. We hold the evidence was sufficient to support Regina's conviction for possession of cocaine, and therefore affirm the conviction.

### Regina's Using a Firearm During and in Relation to a Drug Trafficking Crime Count

■ Regina contends the evidence is insufficient to support her conviction under 18 U.S.C. § 924(c)(1) because no evidence was presented that she used her firearm. In relevant part, § 924(c)(1) provides that "[w]hoever, during and in relation to any crime of violence or drug trafficking ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years." "This court has found 'using' to 'include[ ] the possession of a firearm which in any manner facilitates the execution of a felony'." *United States v. Wilson,* 938 F.2d 785, 791 (7th Cir.1991) (quoting *United States v. LaGuardia,* 774 F.2d 317, 321 (8th Cir.1985)), *cert. denied,* —— U.S. ——, 112 S.Ct. 946, 117 L.Ed.2d 115 (1992). "In addition, we have previously noted that the nature of the illegal drug business encourages the possession of weapons by its participants." *Id.* "A weapon 'provid[es] the defendant with security and confidence, facilitat[ing] a narcotics transaction." *Id.*

In *Wilson,* the defendant argued that he did not "use" a handgun found locked in a trunk. This court noted that "we will find that a defendant intended to use the firearm in facilitation of a drug related crime 'if it [is] strategically located so as to be quickly and easily available for use during a *drug transaction....*'" *Id.* at 791 (quoting *United States v. Whitley,* 905 F.2d 163, 166 (7th Cir.1990) (emphasis added). The defendant's gun in *Wilson* "was in just such a position: It was strategically located on top of the bag containing the cocaine and the defendant knew where the gun was and it was loaded and readily accessible for use if necessary should any problems arise during the drug transaction." *Id.* Regina's handgun was likewise strategically located: the loaded gun was found next to her eighteen ounces of

cocaine, and the gun was readily accessible for use if necessary should any problems arise during her drug transactions. Because the jury could reasonably infer that Regina "used" the firearm in violation of § 924(c), we affirm Regina's conviction for using a firearm during and in relation to a drug trafficking crime.

## IV. S.T. Cross

■■■ S.T. contends that although the government may have proved he was involved in a conspiracy to distribute cocaine with Dwight, the government did not establish he was involved in the conspiracy charged, i.e., a conspiracy with Ken. Claiming the alleged variance is fatal, S.T. argues for reversal.

"A variance occurs at trial only 'when the terms of the indictment are unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment'." *United States v. Grier,* 866 F.2d 908, 931 (7th Cir.1989) (quoting *United States v. Mosley,* 786 F.2d 1330, 1335 (7th Cir.1986)). If, after reviewing the record, we find "that the jury could rationally conclude that there was one general conspiracy and that the defendants were part of it," then there was no variance between the indictment and the proof adduced at trial which prejudiced the defendants' rights. *Grier,* 866 F.2d at 931 (citing *United States v. Perry,* 550 F.2d 524, 531 (9th Cir.1977)).

Based upon the evidence recounted herein, a rational trier of fact could very easily find beyond a reasonable doubt that S.T. conspired with Ken to possess cocaine with the intent to distribute it as alleged in the indictment. Edwards testified that Ken used S.T. and Dwight to "watch over things." Edwards bought cocaine from S.T. and received a discounted price because of his relationship with Kenneth. On one occasion Edwards arrived at one of Ken's houses and observed S.T., Dwight, and Ken counting so much money that when Edwards left 45 minutes later, S.T., Dwight, and Ken were still counting the money. Andre Welch testified that Kenneth said S.T. was selling for him while Ken was in prison. On one occasion Welch observed Ken and S.T. with three roasting pans full of cocaine. Welch also related how

S.T., Dwight, and Ken pressured him to remain in the ring. Parker testified S.T. accompanied her and Ken on her third trip to Ken's Detroit supplier.

This evidence was more than sufficient for the jury to conclude that S.T. joined in the conspiracy to distribute cocaine with Ken as charged in the superseding indictment. Accordingly, we reject S.T.'s challenge and affirm his conviction for conspiring to possess in excess of five kilograms of cocaine with the intent to distribute.

## V. Reginald Johnson

Reginald contends that a warrant authorizing a search of his apartment did not describe the place to be searched with sufficient particularity, and that the evidence seized as a result of the search should have been suppressed at trial. The facts relevant to this issue follow.

### A.

As the investigation drew to a close in the summer of 1991, Detective Gorecki, the lead investigator, had amassed a great deal of incriminating information concerning the conspiracy. Kenneth Cross was the leader of a family-centered cocaine distribution network (including Reginald Johnson) distributing multi-kilogram quantities of cocaine on a weekly basis. The conspiracy was handling tens of thousands—and at times hundreds of thousands—of dollars of cash and cocaine. Ken was living life in the fast lane; he was making fast cash, driving fast luxury cars, and cavorting with a number of women. He purchased and controlled a small empire of Milwaukee real properties including a residence at 2958 N. 23rd St.

To acquire further evidence against the conspiracy, Gorecki enlisted the help of a female informant, Sabrina Owens, to assist and participate in a series of twelve controlled buys. Before each of the controlled buys Owens was searched for money and cocaine, fitted with a transmitter or tape recorder, and furnished with currency whose serial numbers were recorded. The cocaine for three of these buys was obtained from the house at 2958 N. 23rd St. in Milwaukee.

On September 4, 1991, Detective Gorecki dropped Owens off near one of Cross's grocery stores. Owens entered the store, met Ken, exited the store with him and drove to the house located at 2958 N. 23rd St. Upon arrival, Ken went into the house, retrieved two ounces of cocaine, returned to the car, and sold the coke to Owens for $2,200. On that occasion Owens reported to Detective Gorecki that she thought that Ken had entered the house through a side door and gone upstairs. She also mentioned to Gorecki that Kenneth stated the entire upstairs smelled like cocaine. Additionally, she informed Gorecki that she thought that Dwight's girlfriend, whose name she did not know, lived in the house.

Armed with this and other information he had gathered suggestive of probable cause, Gorecki ran his first utilities check on the 2958 N. 23rd St. address. An electric company representative informed him that there were separate electric bills for the upper and lower floors and that Kenneth Cross was listed as the subscriber for both. According to the representative, Kenneth had paid the bills for approximately one year, until August 15, 1991, when the utilities were disconnected. The representative also advised Detective Gorecki that shortly after August 15, 1991, one "Betsy Terry" had inquired why the electricity had been turned off and had stated that the landlord, Kenneth Cross, was supposed to have paid the bill. Gorecki presumed this "Betsy Terry" was Dwight's girlfriend whom Owens thought might be living there. Finally, the representative informed Gorecki that Cross had given just one phone number for the 2958 N. 23rd St. address added to Gorecki's suspicion that Kenneth was in complete control of the house.

To build his case against Cross and the other conspirators, Detective Gorecki met with Owens for a second controlled buy on September 10, 1991. After Gorecki dropped Owens off near one of Ken's houses, Ken and Owens got in one of his cars and again drove to 2958 N. 23rd St. This time, Owens accompanied Kenneth upstairs where Cross retrieved two ounces of cocaine and sold them to her for $2200. Owens reported to Gorecki

that Kenneth used a key to gain entry into the house.[12]

It was becoming apparent to Detective Gorecki that Kenneth was using the house to process, store and distribute coke. To further his case against Cross, Gorecki arranged for another controlled buy to ascertain whether Ken would once again return to the house to secure the drug. The third buy occurred one week later, on September 17, 1991. On this occasion Owens was accompanied by an undercover female agent, Officer Lambert, posing as Owens's girlfriend. The pair drove to a neighborhood store owned by Gary Petty (who, as referred to earlier, was a member of the conspiracy), where they met either Cleotha or Dwight, who in turn directed them to 2958 N. 23rd St. to obtain cocaine. Owens and Officer Lambert proceeded to the 23rd St. address and upon their arrival, Owens went upstairs where she met Ken and while there observed a kilogram of cocaine. She ordered six ounces of cocaine and returned to the car to get the money from Officer Lambert. After the officer gave Owens the cash, and while Owens was in the house, Lambert paced up and down the sidewalk in front of the house, attracting Ken's attention and prompting him to complain to Owens, "why is she in a hurry. Makes everybody think she's the police." Owens completed the purchase of the cocaine from Cross and departed with Lambert.

Following these three controlled buys, Detective Gorecki conducted surveillance on the N. 23rd Street house in the early daylight hours two to three times a week for several weeks to see what else he could learn about this house (one of Ken's many drug distribution houses). Gorecki observed that the number "2958" appeared next to the door on the front porch but Gorecki never observed anyone entering or leaving the front or side doors. He also noticed that a red convertible Mustang was usually parked out front, and learned from checking the license plates that the car was registered in Reginald Johnson's name. Because the car was usually there early in the morning, Gorecki surmised that Reginald was sleeping there at night. Based on all this information, Gorecki reasonably

---

**12.** At trial, Bessie Perry also testified that Kenneth had a key to the house.

came to believe that the girlfriend Owens had said she thought lived in the house might be Reginald's, not Dwight's. But he could not be sure of this; after all, the house was Kenneth's, and Kenneth had a number of women in his life whom he used to conceal his assets. Based on all the information gathered, it appeared to Detective Gorecki that Kenneth allowed Reginald and his girlfriend, "Betsy Terry,"[13] to stay in the lower flat, while he used the upstairs portion of the house as a cocaine distribution and storage center. Since his informants always connected the cocaine with the upstairs area of the house, Gorecki assumed that Reginald and his girlfriend ("Betsy Terry") might well have lived in the downstairs portion. As Gorecki later swore in an affidavit,

> Based on all the information available to me, I believed that the main targets [i.e., Kenneth Cross, Reginald Johnson et al.] of what was then a two-year investigation, had access to the entire premises, and utilized at least the upper portion of the building to store cocaine. I further believed from information from [Owens] that the upper unit was not used as a living quarters, and that those in the lower unit had access to the entire building.... That prior to executing the warrant, I concluded that the girlfriend [mentioned by Owens] living in the residence was the girlfriend of Reginald Johnson[.][14]

The three controlled buys were but one segment of a large-scale cocaine ring investigation and the 23rd Street house was just one of several houses involved in Kenneth's illegal activities. Based in part on the three controlled buys and on the evidence gathered through the use of other informants, on October 28, 1991, an Assistant U.S. Attorney drafted the following affidavit (based on Detective Gorecki's case notes) which was submitted in support of the application for warrants to search five of Kenneth's houses, including the house on N. 23rd Street:

13. Although the electric company reported the woman's name was "Betsy Terry," in reality her name is Bessie Perry.

14. The information recited in the affidavit was not before the magistrate judge when the warrant was obtained but as the Supreme Court held in *Maryland v. Garrison,* 480 U.S. 79, 85, 107

*AFFIDAVIT IN SUPPORT OF*
*SEARCH WARRANT*

I, THOMAS GORECKI, being first duly sworn on oath, do depose and say,

1. That I am a detective with the City of Milwaukee Police Department (MPD) and have been so employed for the past fifteen (15) years. I have been assigned to the MPD Narcotics Division for five (5) years. For the past eight (8) months, I have been assigned to the Narcotics Section of the Federal Drug Enforcement Administration (DEA) Task Force in Milwaukee, Wisconsin. Through my training and experience, I am familiar with the ways and means of cocaine trafficking in the Milwaukee Metropolitan area.

2. That for well over the past year, the DEA has been investigating a multi-kilogram cocaine dealer operating on the North side of Milwaukee, named KENNETH CROSS, DOB November 8, 1960. Interviews with confidential informants, and potential witnesses, examinations of financial records, police surveillance, and a series of controlled purchases of cocaine has [sic] disclosed that KENNETH CROSS is the leader of a family-centered, cocaine distribution network which distributes multi-kilogram quantities of cocaine in Milwaukee on a weekly basis. The CROSS distribution network includes CROSS family members, S.T. CROSS, JR. (brother), WILLIAM CROSS (brother), HELEN CROSS (mother), JOHN GRIFFIN (cousin), REGINALD JOHNSON, a/k/a "FATS" (cousin), along with DWIGHT JOHNSON a/k/a "BOOKWORM," REGINA RAMSEY, CLEOTHA JOHNSON, a/k/a "BIRDIE," and LINDA WESTMORELAND (girlfriend).

\* \* \* \* \* \*

S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987), "we must judge the constitutionality of [the officers'] conduct in light of the information available to them at the time they acted." Thus we consider the facts that Detective Gorecki stated he knew prior to seeking the warrant.

4. That a review of the tax records for the years 1988 and 1990 shows that KENNETH CROSS failed to file any income tax returns in these years. In 1989, KENNETH CROSS declared rental income of $4,838.00. During the same periods, HELEN CROSS (mother), declared a gross income of $13,766.00 in 1988, and $13,649.00 in 1989. During those same years, KENNETH CROSS purchased at least seventeen (17) rental properties and along with HELEN CROSS, two (2) grocery stores, which were primarily financed with loans secured by other properties previously purchased with drug money. Additionally, on December 5, 1989, KENNETH CROSS paid $13,500.00 in cash to Kathleen Bennett, of Milwaukee, for a 1986 Corvette automobile. In the same year, KENNETH CROSS paid $18,000.00 in cash for the residence at 3079 North 25th Street in Milwaukee. On May 19, 1990, KENNETH CROSS paid $3,500.00 in cash for a Ford F–150 4X4 pickup truck. During 1987, HELEN CROSS made payments on a 1983 Porsche totalling more than $13,000.00. In 1988, HELEN CROSS paid $15,000.00, in cash, down on a 1986 Mercedes from Concours Motors, and $5,149.00 on a building loan from First Interstate. (The sales agreement for the Mercedes reflects that the document was originally signed by KENNETH CROSS and then changed to reflect HELEN CROSS.) During 1989, HELEN CROSS paid over $12,000.00 to First Interstate on secured indebtedness. These payments exceed by far the reported income for KENNETH CROSS and HELEN CROSS and indicate a pattern of concealing assets and laundering money derived from illegal activity.

5. A review of title reports and bank records reveals that within the past three (3) years, KENNETH CROSS, along with S.T. CROSS, JR., and HELEN CROSS has [sic] purchased the following Milwaukee real properties:

3704 West 4th Street

3023 North 22nd Street

3418 West Hadley Street

3007 North 20th Street

3007 North 24th Street

2147/2149 North 36th Street

3607 North 13th Street

3442 North 12th Street

3077/3079 North 25th Street
   (Griffin Grocery Store)

3630 North 4th Street

6. That confidential informant (CI) # 1 is a former close associate of KENNETH CROSS and has received information regarding CROSS's cocaine distribution network directly from KENNETH CROSS and through personal observations. CI # 1 has been proven reliable through extensive debriefings with DEA agents in which CI # 1 has provided detailed information regarding numerous cocaine traffickers in the City of Milwaukee which has been repeatedly corroborated by DEA agents and by information available from other reliable confidential informants. CI # 1 has advised that Kenneth Cross has been distributing cocaine in Milwaukee for the past six (6) years utilizing family and close friends to distribute cocaine and conceal assets. CI # 1 has personally observed CROSS in control of at least six (6) kilograms of cocaine.... CI # 1 is further aware that the group distributes two (2) to three (3) kilograms of cocaine in Milwaukee per week and has purchased two (2) grocery stores, two (2) car washes, a fleet of luxury automobiles, and as many as seventeen (17) inner-city residences to generate rental income and for use as dope houses.

7. That CI # 2 has also provided detailed information regarding drug trafficking to your affiant, which has been independently corroborated by law enforcement officers. CI # 2 states that he has personally observed, within the past year, six (6) kilograms of cocaine at GRIFFIN'S GROCERY STORE, 3079 North 25th Street, as KENNETH CROSS, DWIGHT JOHNSON, REGINALD JOHNSON and others processed the cocaine for distribution. CI # 2 is

also aware that CROSS conceals his drug-derived assets by placing the assets in other people's names.

8. That CI # 3 has been an MPD informant for several years and has provided information which has led to over twenty (20) search warrants and numerous arrests. CI # 3 has advised that CLEOTHA JOHNSON distributes cocaine from KENNETH CROSS through inner-city drug houses. CI # 3 is aware of this information for making purchases of cocaine from CLEOTHA JOHNSON.

9. That CI # 4 is a close associate of KENNETH CROSS, who has purchased cocaine from KENNETH CROSS or his subordinates numerous times over the past three (3) years. CI # 4 was trusted by KENNETH CROSS and other family members and was kept advised of the inner workings of the enterprise ... CI # 4 advises that KENNETH CROSS utilizes numerous girlfriends to conceal his assets and stores luxury vehicles in the garage of LINDA WESTMORELAND at 3745 North 53rd Street in Milwaukee....

10. That CI # 5 has purchased cocaine directly from KENNETH CROSS on several occasions over the past six (6) months and has been present when KENNETH CROSS has spoken with CLEOTHA JOHNSON regarding their cocaine business. CI # 5 has also heard CROSS discussing the cocaine business with REGINALD JOHNSON and DWIGHT JOHNSON.

11. That utilizing the information gathered from the above-referenced and confidential informants, your affiant has arranged a series of controlled purchases of cocaine from KENNETH CROSS, GRIFFIN's GROCERY STORE, and residences owned by CROSS. The specifics of those controlled buys are as follows.

12. That at my direction, a cooperating individual has purchased cocaine under the following circumstances:

\* \* \* \* \* \*

d) That on September 4, 1991, September 10, 1991, and September 17, 1991, this CI purchased cocaine from KENNETH CROSS, which cocaine CROSS retrieved from the residence at 2958 North 23rd Street in Milwaukee. On September 17, 1991, the CI was inside this residence and observed more than one (1) pound of cocaine available for distribution.

\* \* \* \* \* \*

17. That based on the foregoing, I believe that there is probable cause to believe that within the residences at 4462 North 37th Street in Milwaukee, Wisconsin, 3745 North 53rd Street in Milwaukee, Wisconsin, 4620 North 28th Street in Milwaukee, Wisconsin, and 3051 North 23rd Street in Milwaukee, Wisconsin, and 2958 North 23rd Street in Milwaukee, Wisconsin, there can now be found evidence of a conspiracy to distribute cocaine and launder drug profits, including cash, other valuables, records of financial transactions with drug proceeds, address books, drug notes, drug ledgers, guns, scales, packaging equipment, and other cocaine processing materials.

18. That the above residences are particularly described as follows:

1. 4462 North 37th Street is an aluminum-sided building with a green upper portion and a white lower portion; the number 4462 appears on the west side of the building;

2. 3745 North 53rd Street is a white, lannon [sic] stone house with brown trim; the number 3745 appears on the east side of the house;

3. 4620 North 28th Street is a white house with green trim and black metal security gates;

4. 3051 North 23rd Street is a grey, imitation brick, asphalt-sided house; the number 3051 appears on the east side of the house;

5. 2958 North 23rd Street is a two-family residence with beige siding and brown trim; the number 2958 appears on the west side.

On the basis of Detective Gorecki's affidavit, the Magistrate Judge issued five separate

search warrants, each authorizing a search of one of the five houses listed. The search warrant for the N. 23rd St. house described the property as it appeared in the affidavit, "a two-family residence with beige siding and brown trim; the number 2958 appearing on the west side."

Knowing that Kenneth kept close watch over his property and knowing that drug dealers like Kenneth do not hesitate to use lethal weapons to protect themselves and their valuable drug supply, Detective Gorecki assembled four tactical squad officers to assist him in executing the search warrant on the N. 23rd St. property. The search warrant was executed on October 30, 1991. In his affidavit, Detective Gorecki stated that "for tactical security reasons, entry was first made into the lower unit ... because I believed that the lower unit was used as a living quarters and that the upper was used only as a stash house." Although he had been advised by one informant that she had seen someone enter a rear side door he "wasn't familiar with that [entrance]." As the detective explained when asked at trial why he did not enter the building through the side door, "[be]cause there were only four entry team officers I felt it was best to secure the bottom floor and then proceed up. Generally the tactical squad officers don't want to put themselves where they could be in a cross fire position...." With the plan set, the officers executed the warrant. After knocking on the front door and receiving no response, the officers yelled "police" and "search warrant" and forced open the door at 2958 N. 23rd St. They secured the area in three or four minutes, and, after entering from the first floor, raced upstairs to the second floor where they encountered Reginald, holding a loaded .45 caliber semi-automatic pistol, and Billy Ray Griffin in possession of a loaded .380 caliber semiautomatic pistol. During the course of the search of the upstairs premises, Detective Gorecki discovered nine individually wrapped bags of cocaine in a closet area, each containing approximately one ounce of cocaine. He also found a food processor and sifters (used in the process of breaking down chunks of cocaine), a one pound bottle of inositol powder (a cutting agent), C-clamps (used to compress the cocaine and the cutting agent into brick form), latex gloves, a triple beam scale, and a host of drug notes (names, addresses, prices, and quantities). In another area of the flat, Detective Gorecki discovered ammunition for .45, .380, and .357 caliber weapons, and another ounce of cocaine.

## B.

Reginald Johnson contends the gun found in his hand and the cocaine found in his bedroom and kitchen should have been suppressed at trial on the ground that the warrant was overbroad. Relying on *United States v. Hinton*, 219 F.2d 324 (7th Cir.1955); *United States v. Higgins*, 428 F.2d 232 (7th Cir.1970); and *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987), he claims the warrant failed to differentiate between the upstairs and downstairs apartments and thus was overbroad because it did not particularize the exact place to be searched. While the cases Johnson cites appear analogous, as we discuss below, they are not directly applicable to the present case.

In *Hinton*, an informant notified the police that she had seen four different individuals selling heroin the previous day "on the premises at 6423 Champlain Avenue in the City of Chicago[.]" The structure at this address was a four-unit apartment building, "the basement and each of the three upper floors of which constitute separate residences." *Hinton*, 219 F.2d at 325. The informant's affidavit did not identify the particular apartment or apartments in which the sales were observed and did not allege that the sales were made in apartments occupied by any of the alleged sellers. Nevertheless, a commissioner issued a warrant "commanding the search of the entire building, 'basement and three floors'." *Id.* Evidence was seized from the search so commanded and admitted against the defendants at trial. *Id.*

The *Hinton* court reversed the defendants' convictions, holding the evidence seized should have been suppressed. The court initially noted that "[f]or purposes of satisfying the Fourth Amendment, searching two or more apartments in the same building is no different than searching two or more com-

pletely separate houses. Probable cause must be shown for searching each house, or, in this case, each apartment." *Id.* at 326. After observing that "a warrant which describes an entire building when cause is shown for searching only one apartment is void[,]" the court stated that it was not being "overtechnical" in insisting "that in issuing search warrants the requirements of the Fourth Amendment be met." *Id.* The court was "determined to discourage the practice of issuing warrants without a sufficient showing. of cause, or, as in this case, when the cause shown does not cover as broad an area as the command to search." *Id.* at 327. Because no probable cause had been shown justifying a search of the entire apartment building, the warrant was considered to be invalid when issued. As a result, the search was illegal and the evidence was ordered suppressed. *Id.*

As is evident from the above discussion, the affiant (law enforcement officer) who sought the warrant in *Hinton,* did not have probable cause to search *any* particular apartment unit in the apartment building. He only knew that illegal activity was occurring somewhere in the four-floor, four-unit building, i.e., in one of the units. Such a generalized search violated the Fourth Amendment because the officer was in effect playing a "shell game" searching for the one apartment out of four where the illegal activity was occurring. The facts in the present case differ vastly in this key respect: Detective Gorecki believed he had probable cause that illegal activity was occurring in both the upper and lower units and thus he sought and obtained a warrant to search both the upper and lower units. We will discuss this distinction in greater detail below.

The defendants have also cited *United States v. Higgins,* 428 F.2d 232 (7th Cir. 1970), in which we relied on *Hinton* to suppress evidence. In *Higgins,* the law enforcement officer received a warrant to search the "basement apartment" of an apartment building where the defendant, James Higgins, was reportedly dealing heroin. Upon execution of the warrant, it was discovered that there were three separate apartments in the basement of the building. The officers searched all three units and found evidence of drug dealing in Higgins' apartment whom they arrested. In *Higgins,* this court affirmed the trial court's granting the motion to suppress in part because the warrant did not "particularly describe the place to be searched."

*Higgins* is distinguishable from the case before us because in *Higgins,* the warrant authorized the search of one apartment unit when in reality there were three separate apartment units. The officers could not determine from the warrant which of the three units to search, thus the warrant failed to describe the place to be searched with particularity. In the case before us, Detective Gorecki knew there was an upper and lower unit of the house at 2958 N. 23rd Street and he intended to search both units for, as we will explain below, he believed that the drug conspirators had control over both units. Since he knew there were two units and he intended to search both units, we must determine whether he had a good faith belief that the Cross conspiracy was using both the upper and lower units to further their drug enterprise. *See United States v. Leon,* 468 U.S. 897, 922–23, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984) (holding suppression is inappropriate when officer has a good faith reliance on a facially valid warrant).

In *Garrison,* Baltimore police officers obtained and executed a search warrant to search the person of Lawrence McWebb and "the premises known as 2036 Park Avenue third floor apartment." When the police applied for the warrant and conducted the search, they reasonably believed there was only one apartment on the premises described in the warrant. In fact, however, there were two apartments on the third floor; McWebb occupied one, and Garrison the other. Before the officers realized they were mistakenly in Garrison's apartment, they discovered contraband leading to Garrison's arrest and conviction. The Supreme Court determined that two separate constitutional issues were implicated: "one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." *Garrison,* 480 U.S. at 84, 107 S.Ct. at 1016.

Initially, the Court observed that the Fourth Amendment's Warrant Clause "categorically prohibits the issuance of any warrant except one 'particularly describing the place to be searched and the persons or things to be seized'." *Id.* The particularity requirement was meant to prevent general searches. "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.* The Court continued:

> With the benefit of hindsight, however, we now know that the description of [the place searched] was broader than appropriate because it was based on the mistaken belief that there was only one apartment on the third floor of the building at 2036 Park Avenue. The question is whether that factual mistake invalidated a warrant that undoubtedly would have been valid if it had reflected a completely accurate understanding of the building's floor plan.
>
> Plainly, if the officers had known, or even if they should have known, that there were two separate dwelling units on the third floor of 2036 Park Avenue, they would have been obliged to exclude [Garrison's] apartment from the scope of the requested warrant. But we must judge the constitutionality of their conduct in light of the information available to them at the time they acted. Those items of evidence that emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued. Just as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant. The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate.

*Id.* at 85, 107 S.Ct. at 1017 (footnotes omitted). Although "[a]rguments can certainly be made that the police in [Garrison's] case should have been able to ascertain that there

was more than one apartment on the third floor of this building[,]" *id.* at 86 n. 10, 107 S.Ct. at 1017 n. 10, the U.S. Supreme Court concluded the warrant was valid when issued. Inquiry was made to determine the identity of the third floor occupant. The outside address matched that given by the informant. The officer ran a utilities check and also learned that the Baltimore Police Department's records matched the suspect's address and physical description given by the informant. *Id.*

After determining that the search warrant was valid, the *Garrison* Court next turned to reasonableness of the search of Garrison's apartment. It observed that if the officers had known or should have known that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been made aware of an error in the warrant, the officers would have been obliged to limit their search to McWebb's apartment. *Id.* at 86–87, 107 S.Ct. at 1017–18. Once the officers were on notice of a risk that they might be in a unit erroneously included within the terms of the search warrant, they were required to withdraw and discontinue the search of Garrison's apartment. *Id.* at 87, 107 S.Ct. at 1018. In sum, "the validity of the search of the entire third floor depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88, 107 S.Ct. at 1018. Because the "objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises," *id.*, the officers' failure to realize the overbreadth of the warrant "unquestionably was" understandable and reasonable. Thus, the Supreme Court concluded the evidence found in Garrison's apartment should not have been suppressed.

In *Garrison,* as in *Higgins,* the warrant authorized the search of one apartment unit when in fact there was more than one unit. The officers did not discover the existence of multiple units until the very moment they executed the warrant. In the instant case, as stated previously, Gorecki knew there were two units in the house at 2958 N. 23rd Street (he described the house in his affidavit

as a "two family residence" and testified that it was a "duplex") and he intended to search both units. For purposes of the Fourth Amendment, the *Hinton/Garrison* analysis is inapplicable in this case because the question is not whether Detective Gorecki knew or should have known whether there were two units in the building at 2958 N. 23rd Street, of course he knew. The question before us is whether Detective Gorecki, in good faith, believed the defendants had access to both the upper and lower units in the furtherance of the drug conspiracy.

■ Initially, we note that the warrant did describe the place to be searched with particularity stating that the house was "a two-family residence with beige siding and brown trim; the number 2958 appearing on the west side." The only problem with the description was that it did not include the fact that 2958A is the address of the upper unit. This omission, however, is not fatal for the warrant accurately described the house to be searched and there was no risk that the officers executing the warrant would search some other house. *E.g., United States v. Valentine,* 984 F.2d 906, 909 (8th Cir.1993) (upholding a search warrant which contained an incorrect address because "[t]he warrant describe[d] the target [building] in detail, and the search was confined to th[at] building. Mere technical errors in particularity are not enough to invalidate a search warrant."), *cert. denied,* —— U.S. ——, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993). Although the number 2958A was located on the side of the house, Detective Gorecki was neither negligent nor reckless for failing to have knowledge of the number's existence. The number was located toward the rear of the house and Ken Cross and his co-conspirators guarded the entire premises with lethal weapons. *See Franks v. Delaware,* 438 U.S. 154, 155, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978) (invalidating a warrant only if the affiant made representations that involved "intentional" or "reckless" disregard for the truth). In *Franks,* the Supreme Court held that "the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* at 171, 98 S.Ct. at 2684. Clearly Reginald's appeal falls far short of demonstrating intentional or reckless disregard for the truth on the part of Detective Gorecki for failing to identify the number 2958A. The warrant in question authorized the search of the entire house located at 2958 N. 23rd and that is in fact what was searched, thus it satisfies the particularity requirement.

■ The defendant argues that in "multiple dwelling" cases we must suppress all the evidence seized pursuant to the overbroad warrant. While that may be true when the warrant authorizes the search of an entire structure and the officers do not know which unit contains the evidence of illegal conduct, that analysis does not apply when (1) the officer knows there are multiple units and believes there is probable cause to search each unit, or (2) the targets of the investigation have access to the entire structure. *United States v. Gilman,* 684 F.2d 616, 618 (9th Cir.1982) ("[t]he general rule voiding the warrant for an undisclosed multiunit structure, [*see Hinton*] does not apply if the defendant was in control of the whole premises or they were occupied in common, if the entire premises were suspect, or if the multiunit character of the premises was not known to the officers"). In the case before us, Gorecki did not differentiate between the upper and lower units of the house because although he knew it was a duplex, he was unaware of the fact the upper unit's number was 2958A and because he believed the defendants had access, and were in fact using, the entire house for their illegal drug activity.

In regard to whether Gorecki had a good faith belief that the defendants had access to the entire house, we must remember that we do not require factual perfection by the officers involved; we merely require that they act reasonably. As the Supreme Court stated in *Illinois v. Rodriguez,* 497 U.S. 177, 183–84, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990), "[i]t is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally de-

manded of the many factual determinations that must regularly be made by agents of the government ... is not that they always be correct, but that they always be reasonable." Moreover, a warrant "need only be supported by 'probable cause,' which demands no more than a proper 'assessment of probabilities in particular factual contexts....'" *Id.* at 183, 110 S.Ct. at 2799 (quoting *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983)); *see also Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (in which the Supreme Court stated that "probable cause is a flexible common-sense standard").

■ The evidence of probable cause in the warrant is "that on September 4, 1991, September 10, 1991, and September 17, 1991, [the confidential informant] purchased cocaine from KENNETH CROSS, which cocaine CROSS retrieved from the residence at 2958 North 23rd Street in Milwaukee. On September 17, 1991, CI was inside this residence and observed more than one (1) pound of cocaine available for distribution." If the house in question was a single family residence there would be no dispute as to the sufficiency of the affidavit in establishing probable cause. However, Gorecki described the house as a "two-family residence." He testified before the magistrate judge that the house was a duplex and that he intended the warrant to cover "the entire building located at 2958 North 23rd which was described as a two family residence." Thus, Gorecki believed that the affidavit and the warrant authorized a search of both the upper and lower levels of the house.

■ In this regard, the defendant argues that Gorecki should have disclosed to the magistrate that the drug buys all occurred upstairs. Had he done this, and not provided any more evidence meriting a search of the downstairs, then he would have obtained only a warrant to search the upper level. The officers would have found the very same cocaine, processing equipment, and firearms and there would be no basis on which to challenge the search. Gorecki, however, believed that the evidence he had collected, not all of which was recited in the affidavit, was sufficient to merit a search of both the upper

and lower units. Under *Leon,* 468 U.S. at 923, 104 S.Ct. at 3421, "[s]uppression ... remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." The magistrate judge should not have been misled by the information in the affidavit which failed to delineate between the upper and lower units because the affidavit and the warrant both described the house as a "two-family residence." Thus the magistrate judge clearly was made aware of the nature of the house, i.e., it was never referred to as a single family residence. The question is whether Gorecki presented evidence in his affidavit that he "knew was false or would have known was false except for his reckless disregard of the truth." We believe not.

Gorecki knew the premises consisted of two floors, from all appearances, the upstairs portion of the house was used exclusively for storing and distributing cocaine but it was not clear that the upstairs was the only area on the premises being used by the cocaine conspirators. As Gorecki stated, he "believed the main targets ... had access to the entire premises...." Thus as far as he knew, the downstairs may also have been used for stashing cocaine or housing conspirators for it is incredulous that Ken Cross would have permitted anyone not associated with the conspiracy to live in a house from which he was conducting a huge cocaine conspiracy. *See, e.g., Olson,* 978 F.2d at 1480 n. 7 (" '[i]t strikes us as incredible that [a drug dealer] would have a person accompany him to a drug deal ... where that person did not have [the dealer's] utmost trust and confidence. Judges in the federal system ... do not operate in a vacuum, shielded from knowledge of drug operations in the real world ...' ") (quoting *United States v. Perry,* 747 F.2d 1165, 1169 (7th Cir.1984)).

Gorecki found no reason to believe, prior to the search, that anyone actually lived upstairs, despite his conscientious investigative efforts. After calling the local electric company on two separate occasions, Gorecki learned from a representative that there

were two metered billings, both in Kenneth's name. Additionally, the electric company had told him that one "Betsy Terry" had called the electric company about the power and had said that Kenneth was supposed to have paid the bill. Thus, it appeared to Gorecki that the "Betsy Terry" to whom the representative referred must have been the girlfriend Sabrina Owens had said she thought lived inside the house. The fact that Kenneth was responsible for both electric bills furthered Gorecki's knowledge and belief that Kenneth was in complete control of the house. He also knew from a check of real estate records that the building was titled to Helen Cross, Kenneth's mother, and as set forth in the affidavit, he believed that Helen Cross assisted Kenneth Cross in his drug-trafficking enterprise by titling properties obtained with drug proceeds in her name.

In addition to contacting the electric company on two occasions, Detective Gorecki, contrary to the magistrate's assertion, took other steps to determine the true nature of the house. He conducted surveillance on the house two to three times a week for several weeks. Since Gorecki often saw Reginald's car parked outside the house early in the morning, it was logical to infer that Reginald had been spending the night there and that "Betsy Terry" was Reginald's girlfriend, (and not Dwight's, as Owens had hypothesized).

Finally, as previously stated, Gorecki did not know that the upper unit had a separate number (2958A). His lack of knowledge was not in reckless disregard of the truth for the number could not be seen or read from the street. Gorecki knew, in all likelihood, that Kenneth Cross and his cohorts were guarding the premises with lethal weapons and thus it would have been unwise to venture down the narrow sidewalk between the houses to inspect the rear entrance of the house. Moreover, it is irrelevant that the mailbox at the rear side door may have been visible from the street because the issue is not whether there were two units, but whether Gorecki had a good faith belief that the defendants had access to both levels.

The Supreme Court, in *Garrison*, expressly "recognized the need to allow some lati-

tude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id.* at 87, 107 S.Ct. at 1018. Based on all the information Detective Gorecki had compiled at the time he secured the warrant, it was reasonable for him to conclude that the defendants had the run of the entire house; and because numerous drug sales occurred in the house, there was probable cause to search the entire house. We are convinced from our review of the record that Detective Gorecki did act in good faith when requesting and obtaining a search warrant for the entire house and that his mistake was an honest one. Because Gorecki's mistake was honest and reasonable, we agree with the trial court's findings and hold that the evidence from Reginald's upstairs apartment was properly seized and admitted against him at trial.

## CONCLUSION

Cleotha, Dwight, and Regina failed to establish that they were prejudiced by the references to Kenneth Cross's guilty plea. S.T. and Reginald, having mentioned the guilty pleas, may not now claim they were harmed thereby. The district court properly denied the defendants' motion for a new trial on the basis of newly discovered evidence because the evidence the defendants presented was not "newly discovered." The government presented sufficient evidence with which a jury could find beyond a reasonable doubt that Regina was guilty of conspiring to distribute cocaine, possessing cocaine with intent to distribute it, and using a firearm in relation to a drug trafficking offense. Likewise, the government presented sufficient evidence with which a jury could find beyond a reasonable doubt that S.T. conspired with Kenneth to possess cocaine with intent to distribute it. Finally, the trial court did not erroneously refuse to suppress the evidence found in Reginald's apartment.

The respective judgments are

AFFIRMED.