### III. Conclusion

ACCORDINGLY, the Court **DENIES** Defendant Pan–American's Motion for Reconsideration [17].

**UNITED STATES of America**

v.

**David Eugene GRAHAM.**

**Criminal Action No. 4:94–CR–024–01.**

United States District Court,
N.D. Georgia,
Rome Division.

June 10, 1997.

Kent Alexander, U.S. Attorney, David Nutter, Asst. U.S. Attorney, Atlanta, GA, for U.S.

Bruce Harvey, Atlanta, GA, for David Eugene Graham.

### ORDER

HAROLD L. MURPHY, District Judge.

This telemarketing fraud case is before the Court on Defendant's Motion to Suppress [68] and Defendant's Motion for Reconsideration [116].

## I. Background

### A. Procedural Background

On July 31, 1992, and August 1, 1992, officers from the Catoosa County, Georgia, Sheriff's Department conducted two searches of businesses operated by Defendant and seized various items as evidence. Defendant filed a Motion to Suppress the evidence on December 20, 1995, at which time Defendant was represented by appointed counsel. On March 7, 1996, Magistrate Judge William L. Harper held a hearing to consider Defendant's Motion. On March 26, 1996, Defendant moved to dismiss his court-appointed attorney and proceed *pro se,* and Magistrate Harper held a second hearing to consider this request. On April 18, 1996, Magistrate Harper filed a Report and Recommendation denying Defendant's Motion to Suppress and granting Defendant's request to proceed *pro se.*

Defendant and the Government filed various objections and responses to the Magistrate's Report and Recommendation, and the Court adopted the Report and Recommendation on July 26, 1996. On August 15, 1996, Defendant retained new counsel and filed a Motion to Reconsider the Court's Order of July 26, 1996, focusing solely on the evidentiary issues raised by Defendant's Motion to Suppress. The Court held evidentiary hearings on December 18, 1996, and January 3, 1997, and Defendant and the Government subsequently filed Proposed Findings of Fact and Conclusions of Law. The suppression issues now are ready for disposition by the Court.

### B. Factual Background

At the times relevant to this action, Defendant was the proprietor of two businesses known as Classic Car Connection and Sprint Specialties, both of which operated out of Market Square Mall in Ringgold, Georgia. (Tr. of Suppression Hearing on January 3, 1997 ("Tr.III") at 149, 156–57.)

In May 1991, the Tennessee Office of Consumer Affairs received complaints from several customers of Sprint Specialties. (Tr. III at 143–44.) The customers told investigators

they had sent money to Sprint Specialties based on promises by telephone marketers that they had won a "major award." (*Id.*) The customers told investigators that they never received the awards as promised. (*Id.*) As a result of the complaints, Defendant entered into a Voluntary Compliance Agreement with the Attorney General of the State of Tennessee, requiring Defendant to desist from unfair or deceptive acts or practices. (Govt.'s Proposed Findings Ex. A.)

In November 1991, the FBI office in Chattanooga, Tennessee, received a complaint from a customer of Sprint Specialties and opened an investigation into the matter. (Tr. III at 145–46.) In February 1992, an FBI informant contacted the FBI office in Chattanooga and reported that Defendant was operating what appeared to be a telemarketing fraud operation out of the Market Place Mall, using the name Sprint Specialties. (*Id.*)

In early 1992, Larry Black, a major with the Catoosa County Sheriff's Department, sent undercover detectives to Classic Car Connection to monitor the presence of several high-priced cars in the business's showroom, and to advise Defendant that he should obtain a security system for the showroom. (Tr. of Suppression Hearing on Dec. 18, 1996 ("Tr.II") at 42.)

On July 30, 1992, Black received a telephone call from Carl Roberts, who identified himself as the owner of Roberts Motor Company, located in Kingsport, Tennessee. (Tr. II at 3–4.) Roberts claimed to be the owner of a 1987 Chevrolet Corvette ("1987 Corvette"), which he had loaned to Defendant to place in Classic Car Connection's showroom. (*Id.*) Roberts told Black that, after one of Roberts' employees had retrieved the 1987 Corvette from Classic Car Connection, Roberts discovered that the motor and transmission had been removed from the vehicle. (*Id.* at 4–6.) Roberts further informed Black that Roberts had loaned to "David Graham at Classic Car Connection" a 1980 Corvette equipped with a "Miami Vice" conversion kit ("1980 Corvette"), valued at $50,000, and De-

fendant had not returned the vehicle. (*Id.* at 6.)

Black advised Roberts to travel to Black's office in Catoosa County with proof of ownership of the vehicles. (*Id.* at 4.) On July 31, 1992, Roberts arrived at Black's office and showed Black (1) a certificate of title for the 1987 Corvette, issued by the State of South Carolina to John H. Smith, and (2) a certificate of title for the 1980 Corvette, issued by the State of California to Wanda J. Kainz.[1] (*Id.* at 25–26.) Although Roberts was not listed on the titles as the owner of either Corvette, Roberts represented himself to Black as the legal holder of the titles to both vehicles. (*Id.* at 25–26, 49, 52.) Black did not attempt to verify that Roberts was in fact a car dealer or that Roberts legally held the titles to the vehicles. (Tr. II at 49–54.) Black also did not attempt to contact Smith, whose telephone number was attached to the certificate of title for the 1987 Corvette. (Tr. II at 49–50.) Black testified that, in his experience as an investigator, it is common for car dealers to possess "open titles" to vehicles they have acquired. (*Id.* at 48, 50–51.) Consequently, Black concluded that Roberts owned, or was legally entitled to possess, both the 1980 and 1987 Corvettes. (*Id.* at 25–26, 49, 52.)

Following Black's instructions, Roberts presented the car titles and repeated the facts described above to Catoosa County Magistrate Judge Dave Carlock. (*Id.* at 6–7.) Magistrate Carlock issued two warrants for Defendant's arrest for the theft of the 1980 Corvette and the 1987 Corvette's motor and transmission. (*Id.* at 7–9.) The warrants show Roberts to be the owner of both the 1980 and 1987 Corvettes. (Govt.Ex. 6.)

Roberts returned to Black's office and presented Black with the arrest warrants. (Tr. II at 9–10.) Black prepared an affidavit to obtain a warrant to search Classic Car Connection for the 1987 Corvette's motor and transmission. (*Id.*) In the affidavit, Black described the place to be searched as "Classic Car Connection, Cloud Springs Rd. (Market Place Mall), Ringgold, Georgia." (*Id.*;

---

1. The titles themselves, marked as Government's Exhibits 9 and 10, were not admitted into evidence during the suppression hearings. The Court therefore must rely solely on Black's testimony with respect to the information that was provided to him by Roberts on July 31, 1992.

Govt. Ex. 1, at 3.) The affidavit further specified that "said Classic Car Connection [is] located in Market Place Mall." (Govt. Ex. 1, at 3.) Ronald Roach, a detective with the Catoosa County Sheriff's Department, submitted the affidavit to Magistrate Judge Peggy Roberson, who signed a search warrant authorizing officers to search for "a 350 cubic inch motor and transmission (ser # H5113297) for a 1987 Chevrolet Corvette, (VIN # 1G1YY3188H5113297)" at "Classic Car Connection, Cloud Springs Rd. (Market Place Mall), Ringgold, Georgia." (Tr. II at 9–11; Govt. Ex. 1.)

Market Place Mall is a rectangular structure totaling 229,000 square feet. (Def.'s Ex. 1.) The mall is divided into three sections. The center section consists of a rectangular area divided into approximately 35 smaller retail units, with a wide pedestrian walkway down the middle. (Def.'s Ex. 19.) The remaining two sections are large, square-shaped "store rooms" that flank each end of the center section. (Id.) The mall has three front entrances: one in the center section leading to the pedestrian walkway and the smaller retail units, and one entrance into each of the two square store rooms. (Id.) Classic Car Connection occupied the store room on the mall's south side, which consisted of approximately 30,000 square feet. (Id.; Tr. III at 150–51.)

On July 31, 1992, Black knew that Classic Car Connection was a distinct business with an entrance that was separate from the main entrance to Market Place Mall. (Tr. II at 39.) Black also knew that the remainder of Market Place Mall was vacant, as the mall had gone out of business some time earlier. (Tr. II. at 34–35, 65; Tr. III at 84.)

Before executing the search warrant, Black telephoned Sam Bowman of Bowman Realty and learned that Defendant had leased the entire Market Place Mall. (Tr. II at 11.) Black testified that, based partly on his knowledge of Defendant's lease, he believed the search warrant authorized him to search the entire mall, rather than solely the south store room housing Classic Car Connection. (Tr. II at 11–12.)

On May 31, 1992, Black and approximately a dozen other officers from the Catoosa County Sheriff's Department, the Georgia State Patrol, and the Georgia Bureau of Investigation executed the search warrant. (Tr. II at 11; Tr. III at 82.) The officers entered through the front door of the store room housing Classic Car Connection and fanned out to perform a "protective sweep" of both Classic Car Connection and the remainder of Market Place Mall. (Tr. II at 11–16; Tr. III at 91–92.) The purpose of the protective sweep was to check for people or objects that might pose a threat to officers conducting the search. (Tr. III at 98–100.) Two officers performed the sweep inside Classic Car Connection, while the other officers exited a door on the north side of the show room and proceeded into the center section of the mall via the pedestrian walkway. (Id. at 11–16; Tr. III at 92.) Nothing on the exterior of the retail units located in the center section indicated to the officers that the units were used for businesses other than Classic Car Connection, or that they otherwise were not vacant. (Tr. II at 23; Tr. III at 176–77.)

The officers discovered three people working in one of the retail units located in the southwest quadrant of the mall. (Tr. III at 124–25.) The occupied unit had been converted into an office. (Id.) Black ordered an officer to remain outside the office to ensure that its contents were not disturbed, while the remaining officers began searching for the 1987 Corvette's motor and transmission. (Id. at 111.)

The officers did not find the motor and transmission, but instead found the 1980 Corvette in the store room on the north side of the mall. (Tr. II at 23–24.) The officers seized the 1980 Corvette and had it towed away. (Id.; Tr. III at 96.)

Black returned to the retail unit that had been converted into an office and performed a brief search for the motor and transmission. (Tr. II at 19–20.) While in the office, Black noticed telemarketing equipment, stacks of inexpensive gifts, and other office supplies set up in a fashion commonly referred to as a telemarketing "boiler room." (Id. at 16–17.) Black also noticed a letter lying atop a desk adjacent to the office's

entrance. (Id. at 19–20.) Without touching or moving the letter, Black read the top page of the letter and learned that its author had paid several thousand dollars but had not received a "major award" as promised. (Id. at 19–21; Tr. III at 155–17; Govt. Ex. 8.) Black copied the author's name, Bill Mitchell, as well as Mitchell's address and telephone number, into his field notes. (Id.) Black did not seize or disturb any of the items in the office. (Id. at 20.)

After the officers completed the search, Black stationed an officer outside Market Place Mall with instructions to prevent anyone from entering the Mall and disturbing the office. (Tr. II at 27; Tr. III at 129.) Black returned to his office and telephoned Mitchell at the number listed on the letter. (Tr. II at 16, 27.) Mitchell told Black that employees of Sprint Specialties had informed Mitchell he had won a "grand prize" of a new car, and Mitchell subsequently sent $4000 to Sprint Specialties with the understanding that the payments were necessary in order to receive his prize. (Id.) Mitchell further told Black that he never received the car as promised, but had received only "worthless gifts." (Id.)

Black contacted the FBI office in Chattanooga and learned the FBI had received complaints that Defendant was operating a telemarketing fraud operation using the name Sprint Specialties. (Tr. II at 28–29.) This was the first conversation between Black and the FBI agents investigating the telemarketing operation. (Tr. III at 147.)

Based on this information, Black prepared and submitted an affidavit in support of a second warrant to search the telemarketing office. (Tr. II at 29–30.) Black described the location to be searched as "Classic Car Connection, Cloud Springs Rd. (Market Place Mall), Ringgold, Georgia," which is the same description used in Black's first affidavit. (Tr. III at 134.) At approximately 1:30 a.m. on August 1, 1992, Catoosa County Superior Court Judge Joe B. Tucker signed a warrant authorizing the search of "Classic Car Connection, Cloud Springs Rd. (Market Place Mall), Ringgold, Georgia." (Id.) Black believed that this warrant allowed him to search the telemarketing office. (Tr. II at 31; Tr. III at 136.)

Black and other officers returned to Market Place Mall and searched the office. (Id. at 32.) The officers seized numerous items, including a business checkbook for an account owned by Classic Car Connection. (Id.)

## II. Discussion

### A. Whether the Affidavit Filed in Support of the Search Warrant Was Insufficient

In his Report and Recommendation, Magistrate Harper concluded that the search warrant issued by Magistrate Roberson was constitutionally defective. (Magistrate's Report & Recommendation at 8–9.) Magistrate Harper stated that the affidavit filed by Detective Roach in support of the warrant contained insufficient information to support a finding of probable cause. (Id.) Not surprisingly, the Government disagrees with the Magistrate's finding while Defendant wholeheartedly endorses it.

The Court need not decide whether the search warrant was valid, however, because the Court agrees with the Magistrate's conclusion that the search falls within the "good faith" exception set forth in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). (Magistrate's Report and Recommendation at 9–10.)

> In Leon, the Supreme Court recognized a good faith exception to the exclusionary rule for searches conducted pursuant to [invalid] warrants. Observing that the purpose of the exclusionary rule is to deter unlawful police conduct, the Court found that this purpose would not be served, and the rule should not be applied, when officers engage in "objectively reasonable law enforcement activity." [cit.] In particular, the Court held that the suppression of evidence would have no deterrent effect "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope."

*United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir.1990) (quoting *Leon*, 468 U.S. at 918–20).

The Eleventh Circuit recognizes four situations in which evidence seized pursuant to an invalid search warrant must be suppressed notwithstanding *Leon:* (1) the affiant misleads the magistrate issuing the warrant with information the affiant knows is false or would have known is false except for the affiant's reckless disregard of the truth; (2) the issuing magistrate wholly abandoned her judicial role; (3) the warrant is based on an affidavit "so clearly lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) the warrant is "so facially deficient ... that the executing officers cannot reasonably presume it to be valid." *Id.* (quoting *Leon*, 468 U.S. at 923).

■ The Court believes none of these situations is implicated by the facts of this case. First, no evidence suggests that Black or Detective Roach presented Magistrate Roberson with information they knew to be false, or that they would have known to be false absent their reckless disregard for the truth. Defendant argues that, because Roberts' name was not listed on the certificates of title for the Corvettes he alleged Defendant had stolen, Black recklessly disregarded the possibility that Defendant had legal possession of the Corvettes. Specifically, Defendant points out that Black never attempted to verify that Roberts was a car dealer or that Roberts legally held the titles to the Corvettes, nor attempted to contact the people listed on the titles.

Black, however, testified that car dealers commonly possess cars with "open titles," and Black found Roberts to be a respectable and believable person. (Tr. II at 25–26, 48–51.) The Court has observed Black's testimony during the suppression hearing and finds his testimony to be credible. In addition, the reasonableness of Black's belief in Roberts' story is reinforced by the fact that Magistrate Carlock issued two arrest warrants for Defendant after hearing the same information. In these circumstances, the Court cannot conclude that Black and Detective Roach acted in reckless disregard of the truth when they presented Magistrate Roberson with an affidavit identifying Roberts as the owner of the 1987 Corvette's motor and transmission.

Second, the Court believes no evidence supports a conclusion that Magistrate Roberson abandoned her judicial role in signing the search warrant.

■ Third, the Court has examined the affidavit submitted by Roach in support of the search warrant, and concludes that the affidavit is not "so clearly lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Taxacher*, 902 F.2d at 871. The affidavit describes how Roberts, identified as the owner of a 1987 Corvette, complained that the Corvette's motor and transmission had been stolen while being stored at Classic Car Connection. (Govt. Ex. 1, at 3.) The affidavit further provides the exact serial numbers for the motor and transmission, as well as the vehicle identification number for the 1987 Corvette. (*Id.*) Finally, the affidavit states that Defendant, as owner of Classic Car Connection, has denied any knowledge of the whereabouts of the motor and transmission. (*Id.*) While the Court is not prepared to conclude that this affidavit actually establishes probable cause to search Classic Car Connection, the Court finds the affidavit is not so devoid of information supporting probable cause that Black's belief that the affidavit established probable cause is "entirely unreasonable." *Taxacher*, 902 F.2d at 871.

■ Fourth, the Court has examined the search warrant issued by Magistrate Roberson, and the warrant is not "so facially deficient ... that the executing officers [could not] reasonably presume it to be valid." *Id.* The warrant need not contain all the facts set forth in the affidavit; rather, it simply must describe with sufficient particularity the location to be searched and the items to be seized. *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). Magistrate Roberson's warrant identifies the item to be seized as a "350 cubic inch motor and transmission (ser # H5113297) for a 1987 Chevrolet Corvette, VIN # 1G1YY3188H5113297." (Govt. Ex. 1,

at 1.) The warrant further specifies the following location to be searched: "Classic Car Connection, Cloud Springs Rd. (Market Place Mall), Ringgold, Georgia." (*Id.*) The Court believes these descriptions are sufficient for a reasonably well-trained officer to believe the particularity requirement has been satisfied. The warrant therefore is not "so facially deficient ... that the executing officers cannot reasonably presume it to be valid." *Taxacher*, 902 F.2d at 871.

In sum, the Court concludes that Black and the officers acted in good faith when they requested and obtained the search warrant from Magistrate Roberson. Consequently, the validity of the warrant, or lack thereof, will not affect the admissibility of evidence seized as a result of the search. *Leon*, 468 U.S. at 918–20; *Taxacher*, 902 F.2d at 871.

### B. Whether the Scope of the Search Extended Beyond the Description of the Location Contained in the Warrant

Although the Court concludes that Black and the other officers relied in good faith on the validity of the search warrant, the execution of the warrant may be unreasonable under the Fourth Amendment if the officers exceeded the scope of the location to be searched as described in the warrant. Likewise, the execution of the warrant is unconstitutional if the officers exceeded the scope of the items to be seized as described in the warrant.

### 1. Whether the Execution of the Warrant Exceeded the Scope of the Location to Be Searched as Described in the Warrant

■ Defendant argues that the officers exceeded the scope of the warrant by searching units of a multi-unit structure in addition to the unit expressly identified in the search warrant.

A significant body of case law has developed in which courts have examined the validity of searches performed within multi-unit structures. *See, e.g., Maryland v. Garrison*, 480 U.S. 79, 87, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987); *United States v. Johnson*, 26 F.3d

669, 694 (7th Cir.1994); *United States v. Ofshe*, 817 F.2d 1508, 1514 (11th Cir.1987). Defendant cites only *Garrison* to support his position.

In *Garrison*, police officers applied for a warrant to search a building that they erroneously believed to contain only one apartment belonging to Lawrence McWebb, when in fact the building contained two separate apartments. 480 U.S. at 84. After the officers began searching both apartments, they learned that the apartments were distinct, with one rented by McWebb and the other by Harold Garrison. *Id.* At that point, however, the officers already had discovered contraband in Garrison's apartment, and they placed Garrison under arrest. *Id.*

In addressing the reasonableness of the manner in which officers executed the warrant, the *Garrison* Court held that, once officers are on notice that they are searching part of a multi-unit structure that was erroneously included within the terms of a search warrant, the officers are required to withdraw and discontinue the search of that unit. *Id.* at 87. However, because the officers reasonably believed Garrison's apartment was included within the location described in the warrant, the Court found the search to be reasonable under the Fourth Amendment. *Id.* The critical issues in *Garrison* thus were (1) whether the officers should have known that the structure to be searched contained multiple units, and (2) what the officers must do when they realize, in the middle of a search, that the structure they are searching actually contains multiple units. *See Johnson*, 26 F.3d at 694 (interpreting *Garrison*).

In the instant case, Black knew, before executing the warrant, that Market Place Mall contained multiple units, one of which was Classic Car Connection. Thus, the Court's analysis must focus on whether Black's understanding that the warrant allowed him to search all the separate units in Market Place Mall was reasonable under the circumstances. (*Id.*)

The Court believes Black's understanding that the warrant allowed officers to search all the units in Market Place Mall was reasonable for two reasons. First, Black knew the

units all were leased to and under the control of Defendant, and nothing inside the mall indicated otherwise. *See Ofshe,* 817 F.2d at 1514. Second, Black had a good faith belief that the units might be used to facilitate the criminal activity implicated in the search warrant, because the units were in the same building as Classic Car Connection, were easily accessible to Defendant, and were vacant. *See Johnson,* 26 F.3d at 692.

In *Ofshe,* officers possessed a warrant that described the place to be searched as:

> Appliance King, Division of Fed–Air of Florida, Inc., located at 2216 S.W. 60th Terrace, Miramar, Florida, a two-story concrete and masonry building, white in color, and its contents. . . .

817 F.2d at 1514. In fact, the structure located at 2216 S.W. 60th Terrace housed seven distinct offices. *Id.* When executing the warrant, the officers in *Ofshe* believed, up until the time they entered the premises, that the building consisted of only one single unit, rather than separate offices. *Id.* Once the officers were inside the building, they discovered the separate offices, but also observed a suspicious "connection" between the defendant and the owner of the building. *Id.* The officers searched only those units of the building that were rented by or otherwise under the control of Appliance King. *Id.* Under these circumstances, the court concluded that the officers' search was reasonable under the Fourth Amendment. *Id.*

Unlike the officers in *Ofshe,* Black knew at the time he obtained the search warrant that Market Square Mall consisted of separate units. Black also knew that the unit housing Classic Car Connection was a distinct unit from the remaining portion of the mall. However, this knowledge in and of itself does not render unreasonable Black's decision to search all the units contained in the mall, because Black knew that Defendant, the sole proprietor of Class Car Connection, leased and controlled the other units in the mall.

In *Johnson,* the Seventh Circuit confronted a similar situation in which officers knew the building to be searched contained multiple units and intended to search all the units.[2] 26 F.3d at 692. The defendants argued that, because only one of the units was suspected to house drugs, the officers did not have probable cause to search all units in the building. *Id.* The court concluded that, when officers know a building contains multiple units and intend to search all units, a warrant to search all units in the building is valid under the Fourth Amendment if the officers have a good faith belief that all the units are involved in the criminal activity underlying the warrant. *Id.* The officers in *Johnson* satisfied this standard because they reasonably believed the individuals participating in the criminal activity implicated by the warrant had access to or control over all the units to be searched. *Id.* at 694. This belief, the court stressed, need only be reasonable under the circumstances—the officers need not be factually correct in all respects. *Id.*

The Court finds the search conducted in this case to be consistent with the searches in *Johnson* and *Ofshe.* As in *Ofshe,* the search warrant described both a single business entity and the building in which the business was located, without distinguishing other units contained within the building. Black and the officers who performed the search believed the mall was vacant, and knew Defendant had rented and exercised control over the entire premises. Moreover, nothing on the inside of the mall conveyed to the officers that the telemarketing office was not accessible to Defendant or otherwise under his control.

Given these circumstances, the Court concludes that Black reasonably believed the search warrant issued by Magistrate Roberson allowed the officers to search the entire mall for the motor and transmission alleged to have been stolen by Defendant. Accordingly, with respect to the places searched, the scope of the search was reasonable under

---

2. *Johnson* involved the validity of the warrant obtained by the officers rather than the reasonability of the execution of the warrant. The Court nonetheless finds the principles set forth in *Johnson* apply with equal force to this case.

the Fourth Amendment.[3]

### 2. Whether the Search Exceeded the Scope of the Items Described in the Warrant

■ The search warrant issued by Magistrate Roberson listed the item to be seized as a "350 cubic inch motor and transmission (ser # H5113297) for a 1987 Chevrolet Corvette, VIN # 1G1YY3188H5113297." (Govt. Ex. 1, at 1.) During the search, however, Black seized a 1980 Corvette and copied into his field notes a name, address, and telephone number printed on a letter sent to Sprint Specialties, Defendant's telemarketing business. Defendant's Motion to Suppress addresses only the copying of the name, address, and telephone number, arguing that Black seized this information and therefore exceeded the scope of the search allowed by the warrant.

The Court agrees that the search warrant did not authorize the officers to search documents for information related to Sprint Specialties. The Government contends, however, that the copying of the name, address, and telephone number falls within the "plain view" exception to the warrant requirement.

■ The "plain view" exception has come to refer to two distinct legal doctrines: (1) the principle that a warrantless seizure of an item in plain view passes constitutional muster where (a) there has been a prior valid intrusion, (b) the evidentiary nature of the item is immediately apparent, and (c) the discovery is inadvertent; and (2) the principle that officers do not perform searches within the meaning of the Fourth Amendment when they discover something through the use of their senses from a vantage point at which their presence is constitutionally permissible. *See United States v. Williams*, 822 F.2d 1174, 1182 n. 82 (D.C.Cir.1987) (citing *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), and 1 Wayne LaFave, Search & Seizure § 2.2, at 240–42 (1978)). This case involves the latter doctrine, in that Black simply read and recorded a name and telephone number from a letter without touching or disturbing the letter itself. Black's actions therefore do not constitute a "search" or a "seizure" for Fourth Amendment purposes.[4] *Hicks*, 480 U.S. at 328; *United States v. Rodgers*, 924 F.2d 219, 221 (11th Cir.1991) ("inspection that involves merely looking at what is already exposed to view, without disturbing it—is not a 'search' for Fourth Amendment purposes, and therefore does not even require reasonable suspicion") (internal quotation omitted).

The Court already has concluded that Black's presence in the telemarketing room was constitutionally permissible. (*See* Part II.A., *supra.*) Because Black simply used his senses to read and record information from the letter without touching or disturbing it, the Court concludes Black's actions fall within the "plain view" exception to the warrant requirement. *Williams*, 822 F.2d at 1182 n. 82. Evidence obtained as a result of Black's actions therefore is admissible under the Fourth Amendment.

### C. Whether the Search Conducted on May 31, 1992, Taints Evidence Obtained in Subsequent Searches

The Court has concluded that the search conducted on May 31, 1992, comports with

---

3. Defendant raises various arguments questioning Black's good faith in searching the telemarketing office for the missing motor and transmission. Stated simply, Defendant argues that Black knew or suspected Defendant was operating the telemarketing office and used the warrant to gain access to the telemarketing office. Defendant's theory is supported only by speculation and finds no support in the record; in fact, the only evidence in the record reveals that Black had not communicated with FBI agents investigating Sprint Specialties until after Black performed the search. (Tr. III at 147.) The Court therefore has no reason to alter its conclusion

regarding the reasonability of the locations searched by the officers.

4. Because Black's recording of the information is not a search or seizure, Defendant's argument that Black needed probable cause to read the letter is misplaced. *Hicks* held that an officer must have probable cause to *search* and *seize* an item found in plain view; no such requirement arises when the officer simply records information from the item in question without moving or otherwise disturbing it. *Hicks*, 480 U.S. at 324, 327–28.

the requirements of the Fourth Amendment. Therefore, evidence seized during subsequent searches that arose out of information obtained during the May 31, 1992, search is not subject to suppression on this ground.

### III. Conclusion

ACCORDINGLY, the Court **DENIES** Defendant's Motion to Suppress [68] and **DENIES** Defendant's Motion for Reconsideration [116].